UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Cause No. |
| Plaintiff, | ) 3:20-CR-00012-RLY-MPB |
| | ) Evansville, Indiana |
| vs. | ) **November 12,** 2021 |
| | ) 1:08 p.m. |
| TRENT WALKER, | ) |
| | ) |
| Defendant. | ) |

**Before the Honorable**
**RICHARD L. YOUNG**

OFFICIAL REPORTER'S **REDACTED** TRANSCRIPT OF
PLEA AND SENTENCING

**For Plaintiff:**                            Tiffany J. Preston, Esq.
                                             Assistant U.S. Attorney
                                             United States Attorney's Office
                                             10 W. Market Street, Suite 2100
                                             Indianapolis, IN  46204

**For Defendant:**                            Shaunda Lynch, Esq.
                                             3820 Oak Hill Road
                                             Evansville, IN  47711

Court Reporter:                              Margaret A. Techert
                                             United States District Court
                                             101 NW Martin Luther King Blvd.
                                             Evansville, Indiana  47708

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

```
 1                        (In open court.)
 2              THE CLERK:  All rise.  Court is in session.  Please
 3    be seated.
 4              THE COURT:  Good afternoon.
 5              MS. PRESTON:  Good afternoon, Your Honor.
 6              MS. LYNCH:  Good afternoon, Your Honor.
 7              THE COURT:  We're here today in the matter of United
 8    States of America versus Trent Walker, 3:20-cr-12.  Mr. Walker
 9    is here in person in custody with his attorney Shaunda Lynch.
10    United States is here by Assistant United States Attorney
11    Tiffany Preston.
12              MS. PRESTON:  Good afternoon, Your Honor.
13              THE COURT:  Good to see you; and also you,
14    Ms. Lynch.
15              MS. LYNCH:  Your Honor.
16              THE COURT:  My record reflects on June 17, 2021,
17    petition to enter a plea of guilty was filed, along with the
18    plea agreement and stipulated factual basis, and there's an
19    addendum to the plea agreement as well.  My notes indicate on
20    August 31, September 17, October 18, and November 3, 2021,
21    Victim Impact Statements were submitted.  September 17, 2021 a
22    letter in support of defendant.  October 14, 2021, sentencing
23    memorandum filed by the government and November 9, 2021,
24    sentencing memorandum filed by defendant through his attorney,
25    and today's the day set for change of plea and sentencing.
```

1          Is that your understanding of the record, Ms. Lynch?

2          MS. LYNCH:  Yes, Your Honor.

3          THE COURT:  Ms. Preston?

4          MS. PRESTON:  Yes, Your Honor.

5          THE COURT:  You want to come up to the lectern,

6   please?

7          MS. LYNCH:  Yes, Your Honor.

8          (Defendant sworn.)

9          THE COURT:  Mr. Walker, you wish to plead guilty

10  pursuant to the plea agreement?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  You understand you're under oath?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  What does that mean to you?

15         THE DEFENDANT:  That means I must tell the truth.

16         THE COURT:  Tell the truth, exactly right.  You

17  understand if you do not tell the truth, an additional felony

18  may be filed against you, such as perjury or making false

19  statements?

20         THE DEFENDANT:  Absolutely.

21         THE COURT:  Please state your full name.

22         THE DEFENDANT:  Trent Allan Walker.

23         THE COURT:  Mr. Walker, how old are you today?

24         THE DEFENDANT:  Thirty-six.

25         THE COURT:  How far did you go in school?

1              THE DEFENDANT:  Multiple college.

2              THE COURT:  Do you have any difficulty reading or

3    understanding the English language?

4              THE DEFENDANT:  No, Your Honor.

5              THE COURT:  If at any time during this proceeding

6    you do not understand what we're discussing or you have a

7    question about anything, will you make sure to make your

8    attorney aware of your question so we can make our best

9    attempt to answer that for you?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Have you been treated recently for any

12   mental illness or addiction to narcotic drugs of any kind?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Tell me about that.

15             THE DEFENDANT:  I've been treated for mental illness

16   since, I believe, 2017.  I went for treatment at the VA and

17   I've been on medicine since.

18             THE COURT:  Are you still under that treatment?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And are you presently under the

21   influence of alcohol or drugs?

22             THE DEFENDANT:  No, Your Honor.

23             THE COURT:  Are you taking any prescription

24   medication?

25             THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  Does that medication cause you to have
 2    any difficulty understanding what's going on about you?
 3              THE DEFENDANT:  No, Your Honor.
 4              THE COURT:  You feel your mind is clear today?
 5              THE DEFENDANT:  No, Your Honor.  It's just part of
 6    the medicine.  It's the best that it gets though.
 7              THE COURT:  I can't hear you.
 8              MS. LYNCH:  You don't have to lean in.  You can just
 9    speak louder.
10              THE DEFENDANT:  I'm sorry.  It's the best it's going
11    to get, Your Honor.
12              THE COURT:  Okay.  Again, if at any point in this
13    proceeding you do not understand what we're discussing or you
14    have a question about anything, please make your attorney
15    aware of that question.  All right?
16              THE DEFENDANT:  Yes, sir.
17              THE COURT:  Have you received a copy of the
18    indictment in this case?  That's the document containing the
19    formal charges against you.
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Have you had an opportunity to review
22    the allegations contained in the indictment with your attorney
23    Ms. Lynch?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Are you satisfied with Ms. Lynch's
```

 1   representation of you?

 2          THE DEFENDANT:  For the most part, yes, sir.

 3          THE COURT:  I also have a petition to enter a plea

 4   of guilty and a plea agreement and an addendum to the plea

 5   agreement.  And when I refer to the plea agreement, I'm

 6   referring to the petition and the plea agreement and the

 7   addendum as one document.  All right?

 8          THE DEFENDANT:  Yes, Your Honor.

 9          THE COURT:  You understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  There's two documents.  All right?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  There's a plea agreement and an addendum

14   to the plea agreement.  When I refer to the plea agreement,

15   I'm referring both documents as one.

16          THE DEFENDANT:  I understand now, Your Honor.  Thank

17   you.

18          THE COURT:  Have you been able to read and discuss

19   the plea agreement with your attorney?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Is that your signature on the back page?

22          MS. LYNCH:  Did you review what I provided to you,

23   the extra copy?  Is that your signature?

24          THE DEFENDANT:  Yes.  I did sign that, Your Honor.

25          THE COURT:  Your signature on this document,

1   Mr. Walker, tells me, among other things, that you've read

2   them, you understand them, and you agree with them.  Is that

3   true?

4              THE DEFENDANT:  For -- there's a few dates in there

5   that I'm not sure on that didn't quite seem correct but

6   substantially it is correct, Your Honor.

7              MS. LYNCH:  And I've explained to him what *on or*

8   *about* means and that it has to be substantially around the

9   time alleged.

10             THE COURT:  Other than that, you've read them, you

11  understand them, and you agree with them?

12             THE DEFENDANT:  Unfortunately, that is my conduct,

13  Your Honor.

14             THE COURT:  Just answer my question.

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Let's go through them.  Do you have it

17  with you?

18             MS. LYNCH:  Plea agreement?  Yes, sir.

19             THE COURT:  All right.  Again, if you do not

20  understand what we're discussing or you have a question,

21  please make your attorney aware of your question.

22             You'll plead guilty to Counts 1 through 5 charging

23  you committed the offense of sexual exploitation of a child,

24  violation of 18 U.S. Code Section 2251(a).  Plead guilty to

25  Count 6, charging the offense of noticing and advertising

1  child pornography, violation of 18 U.S. Code Section 2251(d).

2  Counts 7 through 11 charge you with the offense of

3  distribution of child pornography, violation of 18 U.S. Code

4  Section 2252(a)(2); and Count 12 charging you with the offense

5  of possession of child pornography, a violation of 18 U.S.

6  Code Section 2252A(a)(5)(b).

7          Are those the charges you wish to plead guilty to?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  All right.  Possible statutory penalties

10  upon conviction.  As to Counts 1 through 6, the mandatory

11  minimum sentence is 15 years in prison, maximum sentence would

12  be 30 years imprisonment, $250,000 fine, and lifetime

13  supervised release following any term of imprisonment.

14          As to Counts 7 through 11, the mandatory minimum

15  sentence is five years in prison, maximum sentence would be 20

16  years in prison, $250,000 fine, and a lifetime of supervised

17  release following any term of imprisonment.

18          As to Count 12, maximum sentence would be 20 years

19  in prison, $250,000 fine, and supervised release between five

20  years imprisonment and life.

21          Do you understand the possible statutory penalties

22  upon conviction?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  If you proceeded to trial, of course the

25  government would have to prove your guilt beyond a reasonable

1   doubt.  The essential elements of these charges that the

2   government would have to prove beyond a reasonable doubt as to

3   Counts 1 through 5:

4          A.  That you, the defendant, did knowingly attempt

5   to employ, use, persuade, induce, entice, and coerce a minor.

6          B.  To engage in any sexually explicit conduct, such

7   as conduct as defined in 18 U.S. Code Section 2256(2).

8          C.  For the purpose of producing any visual

9   depictions of such conduct; and

10         D.  While knowing or having reason to know that such

11  visual depictions would be transported or transmitted using

12  any means or facility of interstate or foreign commerce or in

13  or affecting interstate or foreign commerce or mailed; or such

14  visual depictions were produced or transmitted using materials

15  that had been mailed, shipped, or transported in or affecting

16  interstate or foreign commerce by any means, including by

17  computer, or such visual depictions were actually transported

18  or transmitted using any means or facility of interstate or

19  foreign commerce or in or affecting interstate or foreign

20  commerce or mailed.

21         If the government proved those four essential

22  elements to the jury beyond a reasonable doubt in Counts 1, 2,

23  3, 4 and 5, the jury could vote for conviction in that

24  individual count.

25         If the government failed to prove any one of those

1   four essential elements in any of those Counts 1, 2, 3, 4 and

2   5, the jury could not vote for conviction in that count.

3          Do you understand this?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  As to Count 6, the essential elements

6   are:

7          You, the defendant, knowingly published a notice or

8   advertisement.

9          B.  The notice or advertisement sought or offered to

10  distribute a visual depiction; and (1) the production of the

11  visual depiction involved the use of a minor engaging in

12  sexually explicit conduct, and the visual depiction is of

13  sexually explicit conduct.

14         C.  That you, the defendant, knew the minor depicted

15  was under the age of 18 years; and

16         D.  That you, the defendant, knew or had reason to

17  know that the notice or advertisement would be transported

18  using any means or facility of interstate or foreign commerce,

19  including by computer or mail; or (b) that the notice or

20  advertisement was transported using any means or facility of

21  interstate or foreign commerce, including by computer or by

22  mail.

23         Again, as to Count 6, if the government proved those

24  four essential elements to the jury beyond a reasonable doubt,

25  the jury could vote for conviction.

```
 1              If the government failed to prove any one of those
 2    four essential elements to the jury beyond a reasonable doubt,
 3    the jury could not vote for conviction.
 4              Do you understand this?
 5              THE DEFENDANT:  Yes, Your Honor.
 6              THE COURT:  Count 7 through 11.  The essential
 7    elements are -- and again, there are four.
 8              A.  That you, the defendant, knowingly distributed
 9    the material identified in the indictment.
10              B.  That the material identified in the indictment
11    is child pornography.
12              C.  That you, the defendant, knew that one or more
13    persons depicted in the material identified in the indictment
14    was under the age of 18 years; and
15              D.  That the material identified in the indictment
16    was shipped or transported in a manner affecting interstate or
17    foreign commerce.
18              Again, as to Counts 7, 8, 9, 10 and 11, if the
19    government proved those four essential elements to the jury in
20    each of those counts, the jury could vote for guilty in each
21    of those counts.
22              If the government failed to prove any one of those
23    four essential elements in any of those counts, the jury could
24    not vote for guilt in that particular count.
25              Do you understand this?
```

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Then as to Count 12, three essential

3     elements.  The defendant -- you, the defendant, knowingly

4     possessed material that contained one or more images of child

5     pornography.

6          You knew that one or more persons depicted in the

7     images of child pornography was a minor child; and

8          C.  The devices on which the defendant stored the

9     pornography had been mailed, shipped, transported, or produced

10    using materials that had been mailed, shipped, or transported

11    in a manner affecting interstate or foreign commerce.

12         Again, as to Count 12, if the government proved

13    those three essential elements to the jury beyond a reasonable

14    doubt, the jury could vote for conviction.

15         If the government failed to prove any one of those

16    three essential elements to the jury beyond a reasonable

17    doubt, the jury could not vote for conviction.

18         Do you understand this?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  General provisions.  Sentencing,

21    paragraph 4.  The defendant agrees and understands the Court

22    will use its discretion to fashion a sentence within that

23    statutory range I described for you.  I'll consider factors

24    set forth in the United States Code to determine the

25    appropriate sentence within those statutory ranges.  I'll also

1    consult with and take into account the Advisory Sentencing

2    Guidelines.  The Advisory Sentencing Guidelines are just that.

3    They're advisory in nature.  They're not binding or mandatory

4    on the Court.  I may follow the guidelines, I may not.

5                Do you understand this?

6                THE DEFENDANT:  Yes, Your Honor.

7                THE COURT:  Paragraph 9 on page 7; sentence of

8    imprisonment.  The parties have not agreed upon a specific

9    sentence.  The parties reserve the right to present evidence

10   and arguments concerning what they believe to be the

11   appropriate sentence in this matter.

12               The government has agreed to recommend a sentence

13   within the applicable sentencing guideline range as calculated

14   by the Court during the sentencing hearing.  The defendant is

15   free to recommend any sentence but understands that he cannot

16   be sentenced to a term of less than 15 years imprisonment.

17               Is all that your understanding and agreement?

18               THE DEFENDANT:  Yes, Your Honor.

19               THE COURT:  Paragraph 13, page 9; mandatory special

20   assessment.  The defendant will pay a total of $1,200, that's

21   $100 for each count you're pleading guilty to, on the date of

22   sentencing or as ordered by the clerk of the Court.

23               Paragraph 14, additional special assessment.  The

24   parties agree that the defendant is indigent and should be

25   exempted from paying the $5,000 mandatory additional special

1  assessment to be imposed by the Court and paid by nonindigent

2  federal defendants charged with this offense.

3          Is all that your understanding and agreement?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Fine.  The government will not advocate

6  for a fine at sentencing.  That decision remains with the

7  Court.

8          Restitution.  The parties understand that federal

9  law requires the payment of restitution to the minor victims

10  in the offenses charged in the indictment, some of whom were

11  victims in the child pornography.  And I understand that he's

12  agreed to pay $10,000 to each victim.

13          MS. LYNCH:  That's correct.

14          MS. PRESTON:  Yes, Your Honor.

15          THE COURT:  Minor victims as identified.  The

16  defendant understands United States has already located and

17  identified these victims the defendant exploited.  The

18  defendant understands and agrees he owes that restitution to

19  these victims.

20          Other presently unidentified victims.  The parties

21  understand the United States has not yet determined through

22  its investigation whether any other victims in the child

23  pornography offenses can be identified or will seek such

24  restitution.

25          Parties understand that the Court will determine the

1  payment terms for any restitution.

2          Is all that your understanding and agreement?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Joint agreement of the parties,

5  subparagraph E on page 10.  Parties agree that throughout the

6  defendant's entire sentence and term of supervised release, he

7  will not have -- he will have no direct or indirect contact or

8  communication of any kind with minor victims 1 and 2 as

9  identified in the indictment.  If either of the minor victims,

10 upon turning 18 years of age, desire to have contact with the

11 defendant, the minor victims may petition the Court to change

12 this condition.

13         As to the minor victims, the defendant may also

14 petition the Court to amend this provision but only (1) after

15 the minor victim turns 18; and (2) the U.S. Probation Office

16 has first determined that the minor victim has consented to

17 the defendant filing the petition.

18         If any of the families of the minor victims wish to

19 have contact with the defendant at any time, they may initiate

20 contact with the defendant and the defendant does not need to

21 petition the Court to communicate with them.

22         Is all that your understanding and agreement?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Paragraph 18, forfeiture.  Defendant

25 admits the property listed below constitutes contraband, was

 1   used to facilitate, or constitutes the fruits of the

 2   commission of the offense to which he's pleading guilty and,

 3   therefore, subject to forfeiture to the United States.  And as

 4   you can see at the bottom of that paragraph, a custom-built

 5   computer with seven hard drives, and physical evidence seized

 6   from Walker's residence on August 11, 2019.

 7              Is all that your understanding and agreement?

 8              THE DEFENDANT:  Yes, Your Honor.

 9              THE COURT:  Paragraph 23 on page 18, Sentencing

10   Guideline Stipulations.  Sentencing Guideline Stipulations are

11   agreements reached between you and the government.  They are

12   merely recommendations to the Court.  They are not binding on

13   the Court.

14              Do you understand this?

15              THE DEFENDANT:  Yes, Your Honor.

16              THE COURT:  Parties believe the defendant's offense

17   level is above 43 and therefore, his guideline range is life,

18   but have not agreed upon the precise applicable enhancements.

19   They agree that the Court will make this determination.

20              Is all that your understanding and agreement?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  Acceptance of responsibility.  To date,

23   the defendant has demonstrated a recognition and affirmative

24   acceptance of personal responsibility for his criminal

25   conduct.  Based upon defendant's willingness to accept a plea

1   and enter a plea of guilty to the criminal conduct noted in

2   the agreement, the government agrees defendant should receive

3   a two-level reduction in the offense level.

4          Further, by timely notifying the government and the

5   Court of his intention to enter a plea of guilty, the

6   government at the time of sentencing will request the Court to

7   decrease the offense level by one additional level.

8          Is all that your understanding and agreement?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Paragraph 25, potential civil

11  commitment.  Defendant has been advised and understands that

12  pursuant to 18 U.S. Code Section 4248, he faces potential

13  civil commitment as a sexually dangerous person following the

14  expiration of his term of imprisonment.  He understands that

15  any potential civil commitment would be the subject of a

16  separate civil proceeding.

17         He further understands that no one, including his

18  attorney or the Court, can predict with certainty the effect

19  of his conviction on such civil commitment determination or

20  the likelihood that a civil commitment would be imposed.  He

21  understands a civil commitment can be imposed for an

22  indefinite period of time.  He nevertheless affirms that he

23  wants to plead guilty regardless of any potential civil

24  commitment consequences that his plea may entail.

25         Is that your understanding and agreement?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Paragraph 26, sex offender registration.

3   The defendant shall register as a sex offender with the

4   appropriate authorities of any state in which he resides, is

5   employed, or attends school as required by both federal and

6   state law, pursuant to 18 U.S. Code Section 3583(d) and the

7   Sex Offender Registration and Notification Act at 42 U.S. Code

8   Section 16913.

9          Is all that your understanding and agreement?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Paragraph 27, waiver of right to appeal.

12  The defendant understands he has a statutory right to appeal

13  the conviction and sentence imposed and the manner in which

14  the sentence was determined.  Acknowledging this right, in

15  exchange for concessions made by the government in the plea

16  agreement, defendant expressly waives his right to appeal the

17  conviction imposed in this case on any ground, including the

18  right to appeal conferred by 18 U.S. Code Section 3742.

19         Defendant further expressly waives any and all

20  challenges to the statute to which he's pleading guilty on

21  constitutional grounds, as well as any challenge the

22  defendant's admitted conduct does not fall within the scope of

23  the applicable statutes.

24         Defendant further agrees that in the event the Court

25  sentences the defendant to a sentence within or below the

1  applicable Sentencing Guidelines as calculated by the Court at

2  sentencing, regardless of the defendant's criminal history

3  category or how the sentence is calculated by the Court, then

4  the defendant expressly waives his right to appeal the

5  sentence imposed in this case on any ground, including the

6  right to appeal conferred by 18 U.S. Code Section 3742.  This

7  blanket waiver of appeal specifically includes all provisions

8  of the guilty plea and sentence imposed, including the length

9  and conditions of supervised release and the amount of any

10 fine.

11           Is all that your understanding and agreement?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Mr. Walker, what this paragraph tells us

14 is that in exchange for concessions made to you by the United

15 States in arriving at this plea agreement, if I accept the

16 plea agreement and sentence you pursuant to the plea

17 agreement, then you are giving up or waiving your right to

18 appeal the conviction and sentence in this case to a higher

19 court.

20           Is that your understanding as well?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Did you discuss this with your attorney?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  Is this all voluntary?

25           THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  Concessions here, Ms. Preston?

 2              MS. PRESTON:  Yes, Your Honor.  We agreed, as you

 3   just noted, to not seek a guideline determination above the

 4   Sentencing Guidelines.  So we agreed to recommend a sentence

 5   within the guidelines.

 6              In addition to that, Your Honor, paragraph 16E of

 7   the plea agreement was particularly important and concession

 8   made by the government.

 9              THE COURT:  What paragraph was that?

10              MS. PRESTON:  16E.  It's entitled Joint Agreement of

11   the Parties.

12              THE COURT:  Okay.  All right.  I got you.

13              Ms. Lynch, is that your understanding of the

14   concessions made to your client by the United States in

15   exchange for him giving up or waiving his right to appeal the

16   conviction and sentence in this case to a higher court?

17              MS. LYNCH:  Yes, Your Honor.

18              THE COURT:  Mr. Walker, is that your understanding

19   of the concessions made to you by the United States in

20   exchange for you giving up or waiving your right to appeal the

21   conviction and sentence in this case to a higher Court?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  Discussed all this very thoroughly with

24   your attorney?

25              THE DEFENDANT:  Yes, Your Honor.
```

```
 1              THE COURT:  It's all voluntary?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  And then there's the addendum to the --

 4   wait a second here.  Then there's the addendum to the plea

 5   agreement that we mentioned earlier regarding your cooperation

 6   with the government.  You've been able to read and discuss all

 7   that with your attorney?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  You have signed that document as well?

10              THE DEFENDANT:  Yes, Your Honor.

11              THE COURT:  Mr. Walker, those are the basic

12   provisions contained in the plea agreement that I have in

13   front of me.  Is this your understanding of the complete

14   agreement reached between yourself and the United States?

15              THE DEFENDANT:  Yes, Your Honor.

16              THE COURT:  Has anyone made any promises to you that

17   are not contained in this plea agreement?

18              MS. LYNCH:  That's not to be addressed before the

19   Court.  I have addressed that with the prosecutor.

20              THE DEFENDANT:  No, Your Honor.

21              THE COURT:  Let's go through this again.  Has anyone

22   made any promises to you that are not contained in this plea

23   agreement?

24              THE DEFENDANT:  No, Your Honor.

25              THE COURT:  Is anyone forcing you to plead guilty?
```

 1                THE DEFENDANT:  No, Your Honor.

 2                THE COURT:  Anyone made any threats to get you to

 3   plead guilty?

 4                THE DEFENDANT:  No, Your Honor.

 5                THE COURT:  Plea of guilty is voluntary?

 6                THE DEFENDANT:  Yes, sir.

 7                THE COURT:  Discussed it all very thoroughly with

 8   your attorney?

 9                THE DEFENDANT:  Yes, sir.

10                THE COURT:  Now, do you understand the plea

11   agreement is merely a recommendation to the Court and I can

12   reject that recommendation, without allowing you to withdraw

13   your plea of guilty, and impose a sentence that may be more

14   severe than you anticipate?

15                THE DEFENDANT:  Yes, Your Honor.

16                THE COURT:  Do you also understand the offenses to

17   which you're pleading guilty are felony offenses; and if your

18   plea is accepted, you'll be adjudged guilty of those felony

19   offenses and such adjudication may deprive you of valuable

20   civil rights, such as the right to vote, the right to serve on

21   a jury, the right to hold public office, and of course, the

22   right to possess any type of firearm.

23                Do you understand all this?

24                THE DEFENDANT:  Yes, Your Honor.

25                THE COURT:  Do you also understand that if you're

1   sentenced to prison, upon your release from prison you'll be

2   placed on supervised release.  Supervised release has certain

3   conditions attached to it which you must follow.  If you

4   violate the conditions of your supervised release, what do you

5   think will happen?

6           THE DEFENDANT:  I'll go back to prison, Your Honor.

7           THE COURT:  Makes sense, doesn't it?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  Mr. Walker, we've discussed the charges

10  against you that you're pleading guilty to, the possible

11  statutory penalties upon conviction, the essential elements

12  the government has to prove beyond a reasonable doubt before

13  you can be convicted.  That I'll use my discretion to

14  determine the appropriate sentence in this case within those

15  statutory guidelines -- or statutory ranges I described for

16  you.

17          There's no agreement as to sentence.  The government

18  will recommend a sentence within the applicable sentencing

19  guideline range as determined by the Court.  You're free to

20  argue for any sentence you believe is appropriate, but you

21  understand that 15 years is the minimum sentence I can give

22  you.

23          We've also discussed the mandatory special

24  assessment and restitution.  We've also discussed the joint

25  agreement of the parties, paragraph 16E; the forfeiture of the

1  custom-built computer; Sentencing Guideline Stipulations

2  regarding acceptance of responsibility, and the offense level

3  is above 43, and your waiver of right to appeal in exchange

4  for concessions made to you by the United States in arriving

5  at the plea agreement.

6         Based on this discussion we've had this afternoon

7  and discussions you've had with your attorney --

8         MS. PRESTON:  I'm sorry, Your Honor.  And I may be

9  jumping the gun here.  I wanted to make sure the Court found

10  that it agreed that there was a sufficient factual basis for

11  the plea set forth in paragraph 19.

12         THE COURT:  I'm not there yet.

13         MS. PRESTON:  I'm sorry.  I knew I jumped the gun.

14  Thank you, judge.

15         THE COURT:  So based on this discussion we've had

16  here this afternoon and discussions you had with your

17  attorney, do you understand the possible consequences of your

18  plea of guilty?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Now, have you talked to your attorney

21  about how the Advisory Sentencing Guidelines may apply in your

22  case?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  You understand the Court will not be

25  able to determine your Advisory Guideline Range until the

1  Presentence Investigation Report has been completed, and you

2  and the government have had an opportunity to challenge the

3  reported facts and the application of the guidelines as

4  recommended by the probation officer, and that the sentence

5  ultimately imposed may be different from any estimate your

6  attorney may have given you?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  Do you also understand that after your

9  initial Advisory Guideline Range has been determined, the

10  Court has the authority in some circumstances to depart upward

11  or downward from that Advisory Guideline Range, and I'll also

12  consider other factors set forth in the United States Code

13  that may result in the imposition of a sentence that is either

14  higher or lower than that called for by the Advisory

15  Guidelines.

16        Do you understand this?

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  Do you also understand that parole has

19  been abolished?  If you're sentenced to prison, you'll not be

20  released to parole but you'll be placed on supervised release.

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  Mr. Walker, do you understand you have

23  the right to plead not guilty to these charges and persist in

24  that plea?  You then have the right to a trial by a jury.  At

25  a trial by jury, you would be presumed innocent and the

government would have to prove your guilt beyond a reasonable doubt.  At a trial, you'd have the right to the assistance of counsel for your defense, appointed by the Court if necessary, at trial and every other stage of the proceeding.

You also have the right to see and hear all the witnesses and have them cross-examined in your defense.  You have the right on your own part to decline to testify unless you voluntary elected to do so in your own defense and you have the right to compel the attendance of witnesses to testify in your defense.

Do you understand all these rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You understand should you decide not to testify or put on any evidence, that these facts cannot be used against you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You further understand by entering a plea of guilty, if that plea is accepted by the Court, there will be no trial and you have waived or given up your right to a trial, as well as all those other rights associated with a trial which I've just described for you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You understand we're not going to have a trial in your case?

THE DEFENDANT:  Correct.  Yes, Your Honor.

```
 1              THE COURT:  Do you have a copy of the indictment?
 2              MS. LYNCH:  Judge, I think that's the one document
 3   that I failed to bring to the Court today.
 4              THE COURT:  Ms. Preston, do you have an extra copy?
 5              MS. PRESTON:  I can bring my laptop up and it's on
 6   there, if that's all right.
 7              MS. LYNCH:  I apologize, judge.
 8              THE COURT:  That's all right.
 9              MS. PRESTON:  Actually, the probation officer was
10   kind enough to loan us hers.
11              THE COURT:  Great.  Let's go through the charging
12   document, Mr. Walker.  Again, if you have any questions or do
13   not understand what we're discussing, please make your
14   attorney aware of your question.
15              General allegations for all counts.  At times
16   material to these charges, defendant, Trent Walker,
17   hereinafter Walker or the defendant, was a resident of
18   Rockport, Spencer County, Indiana.
19              Victims.  Pseudonym minor victim 1 represents a
20   seven-year-old minor girl who lived in Whitesville, Kentucky.
21   She was born in 2012.  The pseudonym minor victim 2 represents
22   a seven-year-old minor girl who lived in Spencer County,
23   Indiana.  She was born in 2012.
24              Is all that your understanding?
25              THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  Counts 1 through 5., sexual exploitation

2    of a child.  Between on or about December 23, 2013, and on or

3    about August 11, 2019, Southern District of Indiana and

4    elsewhere, defendant, Trent Walker, did employ, use, persuade,

5    induce, and coerce minors, that being minor victims 1 and 2,

6    to engage in sexually explicit conduct, knowing or having

7    reason to know, that such visual depiction would be

8    transported or transmitted using any means or facility of

9    interstate or foreign commerce or affecting interstate or

10   foreign commerce or mailed, if that visual depiction was

11   produced or transmitted using materials that have been mailed,

12   shipped, or transported in or affecting interstate or foreign

13   commerce by any means, including by computer, if such -- or if

14   such visual depiction has actually been transported or

15   transmitted using any means or facility of interstate or

16   foreign commerce or in or affecting interstate or foreign

17   commerce or mailed.

18          Then as you can see in the spreadsheet there on

19   Counts 1, 2, 3, 4 and 5, there's the date December 24, 2013;

20   December 6, 2016; December 8, 2018; and December 8, 2018.

21   Then there's the file names and you can see those, right?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  And then there's a description of what's

24   in each file.  You can see all that?

25          THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  And you understand the nature of the
 2    allegations contained in Counts 1, 2, 3, 4 and 5?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Is all that true?
 5              THE DEFENDANT:  Yes, Your Honor.
 6              THE COURT:  Count 6, noticing and advertising child
 7    pornography.  Between on or about November 24, 2013, and
 8    continuing until at least on or about April 14, 2019, Southern
 9    District of Indiana and elsewhere, defendant, Trent Walker,
10    did make, print, and publish, and cause to be made, printed,
11    and published, any notice and advertisement seeking and
12    offering to exchange, produce, display, and distribute any
13    visual depiction, the production of such visual depiction
14    involved the use of a minor engaging in sexually explicit
15    conduct as defined in 18 U.S. Code Section 2256(2), and such
16    visual depiction was of such conduct, knowing and having
17    reason to know that such notice or advertisement would be
18    transported using any means or facility of interstate or
19    foreign commerce or in or affecting interstate or foreign
20    commerce by any means including by computer or mailed; or such
21    notice or advertisement was transported using any means or
22    facility of interstate or foreign commerce or in or affecting
23    interstate or foreign commerce by any means including by
24    computer or by mail, all of which is in violation of United
25    States Code.
```

```
 1              Mr. Walker, do you understand the nature of the

 2   allegation contained in Count 6?

 3              THE DEFENDANT:  Yes, Your Honor.

 4              THE COURT:  Is that true?

 5              THE DEFENDANT:  Yes, Your Honor.

 6              THE COURT:  Counts 7 through 11, distribution of

 7   child pornography, violation of 18 U.S. Code Section

 8   2252(a)(2).  On or about the dates listed below in each

 9   separate count, Southern District of Indiana and elsewhere,

10   the defendant, Trent Walker, distributed child pornography

11   that had been mailed, or shipped, or transported in interstate

12   or foreign commerce by any means, including by computer to the

13   person or group described in each count.

14              And again, Mr. Walker, you can see in the

15   spreadsheet there Count 7, 8, 9, 10, and 11, date December 24,

16   2013; April 3, 2019; April 3, 2019; April 14, 2019; and

17   April 14, 2019.  Then the group or persons and then the file

18   name of each file.  Each count of which is a separate

19   violation of United States Code.

20              Do you understand the nature of the allegations

21   contained in Counts 7 through 11?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  Is all that true?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  Count 12, possession of child
```

```
 1   pornography.  On before August 11, 2019, defendant, Trent
 2   Walker, did knowingly possess a custom-built computer with
 3   seven hard drives which contained any visual depiction that
 4   had been mailed, or had been shipped, or transported using any
 5   means or facility of interstate or foreign commerce or in or
 6   affecting interstate or foreign commerce, or which was
 7   produced using materials which have been mailed or so shipped
 8   or transported, by any means including by computer, and the
 9   producing of such visual depiction involved the use of a
10   minor, including a visual depiction of a minor or minors who
11   had not attained 12 years of age, engaging in sexually
12   explicit conduct; and such visual depiction is of such
13   conduct.  All of which is in violation of 18 U.S. Code Section
14   2252(a)(4)(B).
15              Do you understand the nature of the allegation in
16   Count 12?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Is that true?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  And then there's a forfeiture allegation
21   regarding the computer and the hard drives.
22              Do you understand the nature of the forfeiture
23   allegation?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Does the government have a factual
```

1    basis?

2              MS. PRESTON:  Yes, Your Honor.

3              THE COURT:  All right.

4              MS. PRESTON:  Your Honor, if this matter had

5    proceeded to trial the United States would have proven the

6    following facts against Mr. Trent Walker beyond a reasonable

7    doubt.

8              First, Your Honor, and as you just stated, that

9    Mr. Walker -- or the defendant was a resident of the Southern

10   District of Indiana.  Minor victim 1 represents a

11   seven-year-old minor girl who lived in Whitesville, Kentucky,

12   and born in 2012.  Minor victim 2 represents a seven-year-old

13   minor girl who lived in Spencer County, Indiana, and was born

14   in 2012.

15             The United States would have proven, as you just set

16   forth in Counts 1 through 5, that between on or about

17   December 23rd and/or about August 11, 2019, in the Southern

18   District of Indiana and elsewhere, Mr. Walker did employ, use,

19   persuade, induce, and coerce minors, that being minor victims

20   1 and 2, to engage in sexually explicit conduct, knowing or

21   having reason to know that such visual depiction would be

22   transported or transmitted using any means or facility of

23   interstate or foreign commerce or in or affecting interstate

24   or foreign commerce or mailed, or that such depiction was

25   produced using materials that had been mailed, shipped, or

1   transported in or affecting interstate and foreign commerce,

2   including any means including by computer.

3          The United States would have proven each of the

4   allegations set forth in Counts 1 through 5 that you just read

5   to the defendant that were part of the indictment, including

6   the date, the file name, and the description.  The United

7   States would have proven that the images and videos depicted

8   in Counts 1 through 5 constituted child pornography, in that

9   they depicted a minor engaged in sexually explicit conduct.

10  The United States would have proven the descriptions that are

11  included in Counts 1 through 5 were what happened to these

12  minors and what was depicted in each of the videos and images

13  of child pornography.

14          What the United States would have shown is that

15  minor victims 1 and 2 were in Mr. Walker's care, custody, and

16  control when he sexually abused them and produced child

17  pornography of them.  With respect to minor victim 1,

18  Mr. Walker sexually abused minor victim 1 for at least six

19  years and engaged in oral sex and penetration of the vagina

20  and anus by his finger, penis, and by devices.  United States

21  would have proven that Mr. Walker forced minor victim 1,

22  beginning when she was a toddler, to engage in sadomasochistic

23  behavior that caused physical pain and emotional distress.

24  Mr. Walker produced child pornography depicting his sexual

25  abuse of minor victim 1.

1    Regarding minor victim, 2 the United States would

2  have proven beyond a reasonable doubt that he sexually abused

3  minor victim 2 while she was asleep by performing oral sex and

4  digital penetration of minor victim 2's vagina.  Mr. Walker

5  produced child pornography depicting his sexual abuse of minor

6  victim 2.

7    The United States would have proven that Mr. Walker

8  produced approximately 202 and 223 images of minor victims 1

9  and 2.  We would have proven that he produced videos and

10 images of minor victims 1 and 2 because he has a sexual

11 interest in children, specifically, a sexual interest in

12 sadomasochistic sexual behavior in children.

13   Mr. Walker distributed the images and videos he

14 produced of minor victims 1 and 2 to individuals on numerous

15 occasions.  On or about the dates listed in the indictment as

16 set forth in Counts 7 through 11 that Your Honor just read to

17 this defendant, in the Southern District of Indiana and

18 elsewhere, Mr. Walker distributed child pornography that had

19 been mailed, shipped, or transported in interstate or foreign

20 commerce by any means, including by computer to the person or

21 group described in each count that is set forth in Counts 7

22 through 11 of the indictment.

23   We would have shown through forensics, Your Honor,

24 the dates that are listed in Counts 7 through 11 are the dates

25 of distribution to the pseudonyms described in the group or

1  person and the file names that were sent. United States would

2  have also proven that each of those images and videos

3  constituted sexually -- I'm sorry, constituted and depicted

4  sexually explicit conduct of minors as described in the file

5  names.

6       The United States would have proven that Mr. Walker

7  distributed images and videos of minor victims 1 and 2 on a

8  video and image-sharing site protected by anonymizing software

9  to hundreds of members of the site. The site had a chat

10  feature and is dedicated to the production and distribution of

11  child pornography, with a focus on sexual sadomasochistic

12  behavior toward children. Mr. Walker posted tailor-made

13  videos and images on the site, and had control over who was

14  allowed to remain on the site.

15       We would have proven that between November 24, 2013

16  and continuing until at least April 14, 2019, in the Southern

17  District of Indiana, and elsewhere, that Mr. Walker did make,

18  print, and publish, and cause to be made, printed and

19  published, any notice and advertisement seeking and offering

20  to exchange, produce, display, and distribute any visual

21  depiction, the production of such visual depiction involved

22  the use of a minor engaging in sexually explicit conduct, as

23  defined by statute, and that such visual depiction was of such

24  conduct, knowing and having reason to know that such notice or

25  advertisement would be transported using any means or facility

1  of interstate or foreign commerce or in or affecting

2  interstate or foreign commerce by any means including by

3  computer or mailed; or such notice or advertisement was

4  transported using any means or facility of interstate or

5  foreign commerce or in or affecting interstate or foreign

6  commerce including by computer.

7        On August 11, 2019, we would have shown that

8  Mr. Walker did knowingly possess a custom-built computer with

9  seven hard drives which contained any visual depiction that

10  has been mailed, or shipped, or transported using any facility

11  of interstate or foreign commerce or in or affecting

12  interstate or foreign commerce, or which was produced using

13  materials which had been mailed or so shipped or transported,

14  by any means including by computer, and the producing of such

15  visual depiction involved the use of a minor, including a

16  minor or minors who had not attained the age of 12 years,

17  engaging in sexually explicit conduct; and such visual

18  depiction was of such conduct.

19        Mr. Walker used devices that were manufactured

20  outside the State of Indiana to produce, distribute, and store

21  his collection of child pornography, including the videos and

22  images he produced of minor victims 1 and 2.  Mr. Walker used

23  sophisticated methods of tradecraft to mask and obfuscate his

24  true identity and the true location of his internet protocol

25  address in an intentional effort to evade detection by law

enforcement and obstruct justice.  He also instructed others

on how to do the same.

Those are the facts supporting a conviction of

Counts 1 through 12, Your Honor.

THE COURT:  Mr. Walker, before I can accept your

plea of guilty and find you guilty, I have to be convinced of

your guilt beyond a reasonable doubt, just as a jury would

have to be convinced of your guilt beyond a reasonable doubt,

and there's a couple ways we can that.  One is to bring the

investigating agents here into the courtroom and they would

testify as to what the evidence would be at your trial.

Another way we can do that is you and the government

agree as to what the evidence would be at your trial and

that's called a factual basis for the guilty plea, which is

what Ms. Preston just read to the Court.

Is all that your understanding as well?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And what was recited in your plea

agreement as the factual basis for the guilty plea contained

at paragraph 19 would be the evidence at your trial and that

evidence would support a verdict of guilty.

Is that your understanding and agreement?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And Ms. Preston read all that correctly?

THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  As to Counts 1, 2, 3, 4 and 5, the

2   offense of sexual exploitation of a child, violation of 18

3   U.S. Code Section 2251(a), how do you plead, guilty or not

4   guilty to each count?

5          THE DEFENDANT:  Guilty to all counts.

6          THE COURT:  As to Count 6, the offense of noticing

7   and advertising child pornography, violation of 18 U.S. Code

8   Section 2251(d), how do you plead, guilty or not guilty?

9          THE DEFENDANT:  Guilty.

10          THE COURT:  As to Counts 7, 8, 9, 10, and 11,

11   charging you with the offense of distribution of child

12   pornography, a violation of 18 U.S. Code Section 2252(a)(2),

13   how do you plead, guilty or not guilty?

14          THE DEFENDANT:  Guilty to all of those, Your Honor.

15          THE COURT:  And as to Count 12, possession of child

16   pornography, a violation of 18 U.S. Code Section

17   2252(a)(5)(B), how do you plead, guilty or not guilty?

18          THE DEFENDANT:  Guilty, Your Honor.

19          THE COURT:  It is the finding of the Court in the

20   case of United States of America versus Trent Walker, the

21   defendant is fully competent and capable of entering an

22   informed plea.  Defendant is aware of the nature of the

23   charges and the consequence of his plea, and that the plea of

24   guilty is a knowing and voluntary plea supported by an

25   independent basis in fact containing each of the essential

 1   elements of those charges contained in Counts 1 through 12 of

 2   the indictment.  The plea is therefore accepted.  The

 3   defendant is now adjudged guilty of those charges contained in

 4   Counts 1 through 12 of the indictment.

 5              Mr. Walker, do you have any questions about

 6   anything?

 7              THE DEFENDANT:  No, Your Honor.

 8              THE COURT:  At this -- the next stage of this

 9   proceeding will be sentencing.  We're going to review the

10   information contained in your Presentence Investigation

11   Report.  Again, if at any time you do not understand what

12   we're discussing or you have a question about anything, please

13   make your attorney aware of your question.  All right?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  Mr. Walker, as I said, we're going to

16   review the information contained in your Presentence Report.

17   Have you had an opportunity to review the Presentence Report?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  Ms. Lynch, have you had an opportunity?

20              MS. LYNCH:  Yes, Your Honor.

21              THE COURT:  Ms. Preston?

22              MS. PRESTON:  Yes, Your Honor.

23              THE COURT:  I see no objections from the government.

24   I do see what's listed as objections but they appear to be

25   corrections.

1          MS. LYNCH:  They were corrections, Your Honor.

2          THE COURT:  Correction No. 1.  Defendant corrects

3   page 2 as follows.  Defendant was arrested and interviewed by

4   the FBI on August 11, 2019.  Correction 2 corrects page 4.

5   Defendant was arrested on August 11, 2019.  The actual arrest

6   was on August 16, 2019, which is supported by the warrant

7   return submitted by the Marshal Office, as well as the NCIC

8   criminal history record.

9          Any further discussion we need on that?

10          MS. LYNCH:  No, Your Honor.

11          THE COURT:  Mr. Walker, based upon your review of

12   the Presentence Investigation Report, do you find its contents

13   to be true and accurate?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Defendant's been in custody since

16   August 16, 2019.

17          History of the charge is contained in Part A.

18   August 13, 2019, two-count criminal complaint was filed.

19   Count 1, sexual exploitation of a child and Count 2,

20   possession of child pornography.  Defendant was arrested on

21   August 16, 2019, made an initial appearance.  Ultimately

22   detention hearing was waived by the defendant.

23          November 12, 2019, defense counsel filed a motion

24   for examination pursuant to 18 U.S. Code Sec. 4241(b).  Court

25   granted that motion on November 22, 2019.

1           March 3, 2020, 12-count indictment plus forfeiture

2    was filed alleging the Counts 1 through 12, which the

3    defendant has pled guilty to here today.

4           On April 7, 2020, defense counsel filed a motion for

5    examination pursuant to 18 U.S. Code Sec. 4241(b).  That

6    motion was granted April 13, 2020.

7           On April 22, 2020, defense counsel filed an amended

8    motion for examination pursuant to 18 U.S. Code 4241.  That

9    motion was granted April 23, 2020.  On August 26, 2020, a

10   competence report and sanity report completed by forensic

11   psychologist H. Wentowski with the Bureau of Prisons was

12   filed.

13          The evaluation stated the defendant was "not

14   currently suffering from a mental disease or defect rendering

15   him mentally incompetent to the extent he is unable to

16   understand the nature and consequences of the proceedings

17   against him or properly assist in his defense.  He presented

18   with a reasonable degree of factual and rational understanding

19   of the legal proceedings and has a sufficient ability to

20   consult with counsel should he choose.  Thus, in the opinion

21   of this evaluator, Mr. Walker is currently competent to

22   proceed."

23          The sanity report indicated "Mr. Walker was not

24   suffering from a mental disease or defect such that he was

25   unable to appreciate the nature and quality or the

1  wrongfulness of his actions.  Mr. Walker made statements and

2  demonstrated behaviors indicative of an appreciation of the

3  nature, quality, and wrongfulness of his alleged actions."

4          June 17, 2021, defendant filed a petition to enter a

5  plea of guilty and a plea agreement.

6          Offense conduct is listed in paragraphs 20 through

7  29.  The parties indicate to the Court the information --

8  indicating to the Court the information contained in the

9  Presentence Report is true and accurate.  The Court will adopt

10 the findings of the probation officer regarding the offense

11 conduct as its own findings regarding the nature and

12 circumstances of the offense.

13         But in summary, defendant was a resident of

14 Rockport, Spencer County, Indiana.  The pseudonym minor victim

15 1 represents a seven-year-old minor girl who lived in

16 Whitesville, Kentucky, born in 2012 and is the defendant's

17 biological daughter.  Pseudonym minor victim 2 is a

18 seven-year-old girl who lived in Spencer County, born in 2012,

19 and was the defendant's girlfriend's daughter.

20         Between December 23, 2013, August 11, 2019, the

21 defendant did employ, use, persuade, induce, and coerce

22 minors, that being victims 1 -- minor victims 1 and 2, to

23 engage in sexually explicit conduct, knowing or having reason

24 to know that such visual depiction would be transported or

25 transmitted using any means or facility of interstate or

1  foreign commerce.  These images included the following and

2  they're set forth in the spreadsheet here in Counts 1, 2, 3,

3  4, and 5 listing the dates, file names, and description of

4  what is in the file.

5        Minor victims 1 and 2 were in the defendant's care,

6  custody, and control when he sexually abused them and produced

7  child pornography of them.  With respect to minor victim 1,

8  the defendant sexually abused her for at least six years,

9  engaged in oral sex and penetration of the vagina and anus by

10  his finger, penis, and devices.  Defendant forced minor victim

11  1, beginning when she was a toddler, to engage in

12  sadomasochistic behavior that caused physical pain and

13  emotional distress.  Defendant produced child pornography

14  depicting his sexual abuse of minor victim 1.

15        Regarding minor victim 2, defendant sexually abused

16  her while she was asleep by performing oral sex and digital

17  penetration of her vagina.  Defendant produced child

18  pornography depicting his sexual abuse of minor victim 2.

19        Defendant produced approximately 202 and 223 images

20  of minor victims 1 and 2.  He admitted to producing video and

21  images of minor victims 1 and 2 because he has a sexual

22  interest in children, specifically a sexual interest in

23  sadomasochistic sexual behavior in children.

24        Defendant also distributed the image and videos he

25  produced of minor victims 1 and 2 to other individuals on

1  numerous occasions.  On the dates listed in the Presentence

2  Report, paragraph 25 and the spreadsheet, defendant

3  distributed child pornography that had been mailed, shipped or

4  transported in interstate or foreign commerce.

5          Defendant distributed images and videos of minor

6  victims 1 and 2 on video and image-sharing sites protected by

7  anonymizing software to hundreds of members of the sites.  The

8  sites had chat features and were dedicated to the production

9  and distribution of child pornography, with a focus on sexual

10 sadomasochistic behavior toward very young children.  The

11 defendant posted tailor-made images and videos on the site and

12 had control over who was allowed to remain on the sites.  He

13 was a moderator and decided who could gain access to the

14 sites, whether they possessed enough sophistication to remain

15 on the sites, and whether they posted sufficient content, and

16 whether they should be allowed to remain on the sites.

17         Accordingly, between November 24, 2013 and April 14,

18 2019, the defendant --

19         MS. LYNCH:  Your Honor, I'm so sorry.  He has a

20 question.

21         THE COURT:  Yes.

22         (Off the record.)

23         MS. LYNCH:  I'm sorry, Your Honor.

24         THE COURT:  Is that cleared up?

25         MS. LYNCH:  Yes.

1          THE DEFENDANT:  Sorry.

2          THE COURT:  Accordingly, between November 24, 2013,

3    and April 14, 2019, defendant did make, print, and publish, or

4    cause to be made, printed, and published, any notice and

5    advertisement seeking and offering to exchange, produce,

6    display, and distribute any visual depiction, the production

7    of such visual depiction involved the use of a minor engaging

8    in sexually explicit conduct, as defined in United States

9    Code, and such visual depiction was of such conduct, knowing

10   and having reason to know that such notice or advertisement

11   would be transported using any means or facility of interstate

12   or foreign commerce.

13          On August 11, 2019, defendant did knowingly possess

14   a custom-built computer with seven hard drives which contained

15   any visual depiction that had been mailed, or had been

16   shipped, or transported using any means of interstate or

17   foreign commerce, and the visual depictions involved the use

18   of a minor, including the minor or minors who had not attained

19   the age of 12, engaging in sexually explicit conduct and such

20   visual depiction is of such conduct.

21          Defendant used devices that were manufactured

22   outside of Indiana to produce and distribute and store his

23   collection of child pornography, including the videos and

24   images produced of minors 1 -- victims 1 and 2.  Also used a

25   sophisticated method of tradecraft to mask and obfuscate his

true identity and true location of his internet protocol, IP, address in an intentional effort to evade detection by law enforcement and obstruct justice, and instructed others on how to do the same.

Victim Impact.  Obviously the victims are minor victim 1 and minor victim 2.  Victim Impact Statements were filed with the Court.  In addition, the unidentified children portrayed in child pornographic images are victims of the crime and similar offenses.

There's no information defendant impeded or obstructed justice.

Regarding acceptance of responsibility.  Defendant has pled guilty to the charges contained in the indictment. He's admitted his involvement in the offense as detailed in the factual basis for the guilty plea section in his plea agreement.

Offense level computation.  2018 manual was used. Base offense level for a violation of 18 U.S. Code Section 2251A is found at Section 2G2.1(a) calls for base offense level of 32 as to Count 1, sexual exploitation of a child.

Specific offense characteristic.  The offense involved a minor who had not attained the age of 12.  Pursuant to the guidelines, four levels are added.

Specific offense characteristic 2.  The offense involved the commission of a sexual act or sexual contact and

conduct described in 18 U.S. Code Section 2241(a) or (b).
Pursuant to the guidelines, four levels are added.

Specific offense characteristic 3.  Defendant knowingly engaged in distribution.  Pursuant to the guidelines, two levels are added.

Specific offense characteristic 4.  The offense involved material that portrays sadistic or masochistic conduct or other depictions of violence.  Pursuant to the guidelines, four levels added.

Specific offense characteristic 5.  The defendant was a parent, relative, or legal guardian of the minor involved in the offense or the minor was otherwise in the care, custody, or supervisory control of the defendant. Pursuant to the guidelines, two levels are added.

There's no victim related adjustment.  No adjustment for role in the offense.  No adjustment for obstruction. Subtotal 48.

Count 2, sexual exploitation of a child.  Base offense level is found at 2G2.1(a) is 32.  Offense level involved a minor not attained of age of 12.  Four levels are added.

Knowingly engaged in distribution, two levels are added.

Specific offense characteristic 3.  The offense involved material portraying sadistic or masochistic conduct

1    or other depictions of violence.  Four levels are added.

2            And the defendant was a parent, relative, or legal

3    guardian of the minor involved in the offense.  So the minor

4    was otherwise in the care, custody, or supervisory control of

5    the defendant.  Two levels are added.

6            No other adjustments.  Subtotal 44.

7            Count 3, sexual exploitation of a child.  Base

8    offense level, again, 32.

9            Specific offense characteristics are:  The offense

10   involved a minor who had not attained the age of 12.  Four

11   levels are added.

12           Offense involved the commission of a sexual act or

13   sexual contact.  Two levels are added.

14           Specific offense characteristic 3.  Knowingly

15   engaged in distribution.  Two levels are added.

16           Specific offense characteristic 4.  The offense

17   involved material portraying sadistic or masochistic conduct

18   or other depictions of violence.  Four levels are added.

19           Specific offense characteristic 5.  The defendant

20   was a parent, relative, or legal guardian of the minor

21   involved in the offense, or the minor was otherwise in the

22   custody, care, or supervisory control of the defendant.  Two

23   levels are added.

24           No other adjustments.  Subtotal 46.

25           Count 4, sexual exploitation of a child.  Base

offense level is 32.

Specific offense characteristic.  Again, the offense involved the minor who had not attained the age of 12.  The offense involved the -- four levels are added.

The offense involved the commission of a sexual act or sexual contact.  Two levels are added.

Again, defendant knowingly engaged in distribution. Two levels are added.

And the defendant was a parent, relative, or legal guardian of the minor involved in the offense or the minor was otherwise in the custody, care, or supervisory control of the defendant.  Two levels are added.

No other adjustments.  Subtotal 42.

Count 5.  Again, sexual exploitation of a child. Base offense level 32.

Again, the offense characteristics are the offense involved a minor child who had not attained the age of 12.

The offense involved the commission of a sexual act or sexual contact.  Four levels are added for the child not attaining the age of 12.  Two levels are added for the commission of the sexual act or sexual contact.

And defendant knowingly engaged in distribution. Two levels are added.

And again, the defendant was a parent, relative, or legal guardian of the minor involved in the offense or the

1  minor was otherwise in the care, custody, or supervisory

2  control of the defendant.  Two levels are added.

3          No other adjustments.  Subtotal 42.

4          Counts 6 through 12 are grouped, as to count group

5  1, for guideline calculations because the offense level is

6  determined largely on the basis of the total amount of harm or

7  some other measure of aggregate harm, the offense behavior is

8  ongoing or continuous in nature, and the offense guideline is

9  written to cover such behavior pursuant to 3D1.2(d).

10          Count Group 1, noticing and advertising child

11  pornography, distribution of child pornography, and possession

12  of child pornography.  Base offense level is 22.

13          Specific offense characteristic 1.  The material

14  involved a prepubescent minor or a minor who had not attained

15  the age of 12.  Two levels are added.

16          Specific offense characteristic 2.  The defendant

17  knowingly engaged in distribution.  Two levels are added.

18          Specific offense characteristic 3.  The defendant

19  involved -- the offense involved material that portrayed

20  sadistic or masochistic conduct or other depictions of

21  violence.  Four levels are added.

22          Specific offense characteristic 4.  Defendant

23  engaged in a pattern of activity involving the sexual abuse or

24  exploitation of a minor.  Five levels are added.

25          Specific offense characteristic 5.  The offense

1  involved the use of a computer or an interactive computer

2  service for the possession, transmission, receipt, or

3  distribution of material, or for accessing with the intent to

4  view the material.  Pursuant to Section 2G2.1 -- excuse me,

5  2G2.2(b)(6), two levels are added.

6          And the last specific offense characteristic in

7  Count Group 1 is the offense involved 600 or more images.

8  Pursuant to 2G2.2(b)(7)(D), five levels are added.

9          Subtotal 42.

10          Multiple count adjustments.  Count Group 1, the

11  adjusted offense level is 42.  There's a .5 units.  Count 1

12  adjusted offense level is 48.  That is assessed one unit.

13          Counts 2, 3, 4, and 5 are each assessed one unit.

14  Total number of units is 5.5.  The greater of the adjusted

15  offense levels is 48.  The increase offense level is -- the

16  offense levels increase pursuant to the number of units

17  assigned by the amount indicated at the table set forth at

18  3D1.4.  So we add five.

19          Combined adjusted offense level is determined by

20  taking the offense level applicable to the group with the

21  highest offense level, increasing that offense level by the

22  amount indicated in the table.  Puts us at 53.

23          Chapter Four enhancements.  The offense of

24  conviction is a covered sex crime.  Neither 4B1.1 nor

25  subsection (a) of 4B1.5 applies, and the defendant engaged in

1  a pattern of activity involving prohibited criminal conduct.

2  Therefore, the defendant is a repeat and dangerous sex

3  offender against minors.  The offense level shall be five plus

4  the offense level determined under Chapters Two and Three.  In

5  this case, the applicable offense level is 58.

6          Regarding acceptance of responsibility.  The

7  defendant has clearly demonstrated acceptance of

8  responsibility for his criminal conduct.  The offense level's

9  decreased by two.

10         Pursuant to 3E1.1(b), does the -- Ms. Preston, does

11  government have a 1(b) motion?

12         MS. PRESTON:  Yes, Your Honor.  We move at this time

13  for the one point reduction.

14         THE COURT:  All right.  Show that granted.  Total

15  offense level pursuant to Chapter Five are, in those rare

16  instances where the total offense level is calculated in

17  excess of 43, the offense level will be treated as a level 43.

18         Criminal history.  I find no juvenile adjudications.

19         Adult criminal convictions begin with an arrest at

20  age 31 in 2017, leaving the scene of an accident, a

21  misdemeanor in Spencer County, Indiana.  Fine and costs.  Zero

22  criminal history points.

23         April 2018, possession of marijuana,

24  buying/possessing drug paraphernalia, operating a motor

25  vehicle under the influence of alcohol in McLean County,

Kentucky.  Those are all misdemeanors.  June 19, 2018, on

Counts 1 through 3, received 20 days in jail on each count,

conditionally discharged for two years.  Pursuant to 4A1.1(c),

one criminal history point is assessed.

Criminal convictions result in a subtotal criminal

history score of one.

Defendant was -- defendant committed the instant

offense while under a criminal justice sentence for that

McLean County, Kentucky, conviction and sentence referred to

in paragraph 106 of the Presentence Report.  Therefore, two

points are added.

Total criminal history score of three, placing him

in Category II.

No other criminal conduct, no pending charges, no

other arrests.

Background.  Defendant was born in September 1985 in

Paducah, Kentucky.  His father is Timothy Titus.  His mother

is Mildred Walker.  Father resides in Kentucky, works for a

nuclear plant in Paducah.  Mother resides in Owensboro,

Kentucky.  Defendant reports contact with his father once

since his arrest but frequent contact with his mother.

Defendant has one maternal half-sister, age 40,

resides in Owensboro, and has one paternal half-sister, age

26, resides in South Korea and is a teacher.

Defendant reported the family relocated to Texas in

December 1986; lived there until July 1988, when they moved to Kentucky.

August 1992, defendant's parents divorced.  After the divorce, defendant's mother entered a relationship with a Stephen Reising.  Married in 1993.  Defendant's mother and his stepfather remain married.  Great relationship with his stepfather.

Shortly after his parents divorced, defendant's father also remarried.  Defendant reports his parents and stepparents provided all his basic needs.

Defendant describes several instances of sexual abuse throughout his life.  First instance involved an immediate family member.  No further information.  Second incident involved the defendant's grandfather.  No further information.  Another instance involved a childcare provider when he was approximately six years of age.  Last instance occurred when he was between the ages of nine and 13 regarding a male neighbor.  That abuse occurred on a weekly basis.

October 2003, defendant enlisted in the United States Army, traveled extensively in the United States and abroad.  Left the military in July 2011, returned to Owensboro.  December 2014, defendant relocated to Rockport, Indiana.  Purchased a home in Rockport.  That residence has been foreclosed on by the mortgage company and will be sold.

In May 2004, defendant married Theresa Merritt in

1   Kentucky.  No children.  They divorced February 2007.

2          October 2011, defendant married Mary French,

3   divorced November 2013.  One child, age nine, adopted by the

4   mother's current husband and the child lives with the parents

5   in Kentucky.

6          Physical condition.  The defendant, since July of

7   2011, has received disability benefits, 40 percent

8   service-connected disability rating, through the Veterans

9   Administration for cartilage issues in his right knee, right

10  ankle, and both wrists.  He has limited range of motion due to

11  the cartilage issues.  Also indicated he suffered hearing loss

12  while in the military.

13         Not currently prescribed any medication for physical

14  health conditions.

15         Mental and emotional health.  Defendant reports as a

16  child his mother enrolled him in counseling.  He's unsure if

17  it was due to behavior issues or because he struggled with his

18  parents' divorce.  Mother advised defendant was enrolled in

19  counseling when he was approximately nine and participated in

20  treatment for a few years.  Therapist told her defendant

21  suffered from anxiety.

22         When he was in high school, defendant's mother

23  placed him in counseling in Owensboro.  While in a hospital in

24  November 2002, defendant apparently jumped from a two-story

25  window.  Defendant underwent a mental status exam.  Examiner

1  diagnosed the defendant with mild depressive symptoms and

2  suggested he begin antidepressants.  Defendant declined any

3  medication.

4          While in the military, defendant indicated he met

5  with a counselor due to relationship problems with his then

6  girlfriend.

7          From April 2018 to May 2019, defendant sought mental

8  health treatment through the VA, diagnosed with post-traumatic

9  stress disorder, prescribed medication; and anxiety and

10  depression and prescribed medication for that condition.

11  Other medications may have been prescribed for the defendant

12  and not reported to this officer by the VA.  Defendant

13  currently is prescribed medication for his mental health

14  issues.

15          Substance abuse.  Defendant reports first drank

16  alcohol at the age of 12, stopped drinking alcohol in 2013 but

17  resumed in 2016.  Drank approximately four times a week,

18  sometimes to the point of intoxication, until his arrest in

19  2019.

20          First tried marijuana at age 16.  From 2013 until

21  August 2019, reported daily use of marijuana.  April 2018 to

22  May 2019, defendant sought substance abuse treatment through

23  the VA.  At one time he was prescribed medication to curb

24  alcohol cravings.

25          Education.  Defendant reports graduating from high

school in Owensboro in 2003.  Also attended technical college while in high school in Owensboro and technical college for Cisco Networking.

        In spring 2004, 2009, and fall 2009, defendant attended college in Arizona, pursuing an undergrad degree in intelligence op studies.  Spring of 2005, summer 2005, spring and summer 2016, and fall 2007, attended college in Texas. From August 2010 through January 2014, defendant attended an online university working toward an undergrad degree in information technology, security emphasis.

        Employment history.  From 2017 until his arrest in 2019, defendant was self-employed developing software to help automate businesses and hardware automation.  Financially supported by his mother and stepfather during that time. 2016, 2017, defendant reports employment with a bank in Owensboro.  Prior to that, 2015, he was employed as a product manager for Springleaf General Services Corporation here in Evansville.  Defendant continued to work until his position was eliminated in 2016.  Prior to that, he worked at another bank in Owensboro; and prior to that, he was enlisted in the Army from October 2003 to July 2011.

        Financial condition.  Defendant currently receives monthly disability benefits through the VA.  He pays child support arrearage and puts the rest in his commissary account. He does have some outstanding indebtedness.  Looks like a

1   cable provider, utility company, medical bills, cell phone,

2   retail bills.  Also has a child support arrearage.

3           Does not have the ability to pay a fine within the

4   guideline range, in addition to other monetary penalties.

5           Sentencing options.  Under the statute, Counts 1

6   through 6, the minimum term is 15 years in prison; maximum

7   sentence would be 30 years in prison.

8           Count 7 through 11, minimum term is five years in

9   prison; maximum term is 20 years in prison per count.

10          Count 12, maximum term of imprisonment is 20 years.

11          Guidelines.  Based on a total offense level 43

12  criminal history Category II, guideline range of imprisonment

13  is life.  Statutorily authorized maximum sentence are less

14  than the maximum of the guideline range.  Therefore, the

15  guideline range is 3,600 months or 300 years.

16          I did see a 5K1 in the file indicating defendant's

17  cooperation.  Apparently he met and gave a proffer.  Any

18  further comment on your 5K1, Ms. Preston?

19          MS. PRESTON:  No, Your Honor.  It's completely

20  contained with the brief.

21          THE COURT:  Ms. Lynch, any comment on the

22  government's 5K1?

23          MS. LYNCH:  No, Your Honor.

24          THE COURT:  We'll show one-level reduction for his

25  cooperation efforts.  So the total offense level is actually

1   42, criminal history Category II.  Officer Hunt, I don't

2   believe it changes the guidelines, right?

3            PROBATION OFFICER:  Correct.

4            THE COURT:  Supervised release.  Under the statute,

5   Counts 1 through 12, the Court shall impose a term of

6   supervised release of five years to life per count.  They can

7   run currently.  Under the guidelines, term of supervised

8   release is five years.  Therefore, it's five years to life.

9            Probation.  He is ineligible for probation under the

10  statute and ineligible for probation under the guidelines.

11           Paragraphs 165 and 166 recite the mandatory and

12  proposed conditions of supervision.  Mr. Walker, have you been

13  able to read and discuss with your attorney the mandatory and

14  proposed conditions of supervision?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  Do you have any objection to any of

17  those conditions?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  Ms. Lynch, did you see any of those

20  conditions that would generate an objection or cause any

21  concern?

22           MS. LYNCH:  No.  I think he had a concern if -- he

23  certainly has no desire to consume alcohol for the rest of his

24  life.  He did express some concern about if he were in the

25  presence of alcohol, that he could get in trouble for that.  I

1  explained that he's not prohibited from being in places that

2  have alcohol in it but he should not have it in his own home.

3              THE COURT:  Correct.  Does that clear that up,

4  Mr. Walker?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Fines.  Under the statute, Counts 1

7  through 12, maximum fine is $250,000 per count.  Special

8  assessment of $100 per count.

9              Guidelines.  Fine range is $50,000 to $250,000.

10             Restitution, of course, shall be made under the

11 statute and the guidelines.

12             As I indicated earlier, no objections from the

13 government and we've clarified the concerns and noted the

14 corrections that were alleged but actually, defendant's

15 thinking that he was arrested on August 11, 2019 is not

16 correct.  He was arrested on August 16, 2019.

17             Mr. Walker, those are the findings of the Court

18 based on the information contained in the Presentence

19 Investigation Report.  Do you have any questions, comments, or

20 concerns regarding the Court's findings based on the

21 information contained in the Presentence Report?

22             THE DEFENDANT:  No, Your Honor.

23             THE COURT:  At this stage of the proceeding,

24 Mr. Walker, you have a right and an opportunity to make any

25 statement to the Court you wish regarding the issue of the

1  appropriate sentence or for that matter, anything you wish to

2  discuss.  You can also present evidence and testimony

3  regarding the appropriate sentence, and you can have your

4  attorney speak on your behalf as well.

5           And of course, the government has that same right

6  and opportunity to make a comment regarding the appropriate

7  sentence and present evidence in support of those comments.

8           Do you understand all this?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Ms. Lynch, any presentation today?

11          MS. LYNCH:  Your Honor, I do have a presentation

12 pertaining to argument.

13          May I clear something up with him real quick?  I

14 didn't want to interrupt the Court again.

15          THE COURT:  Sure.

16          (Off the record.)

17          MS. LYNCH:  He does have a statement that he wants

18 to read.  His preference, though I said this is your

19 courtroom, we'll do it the way you want to do it, Your Honor,

20 is that I make my presentation to the Court and then he read

21 his statement last.

22          THE COURT:  That's fine.

23          MS. LYNCH:  Is that acceptable?

24          THE COURT:  Sure.

25          MS. LYNCH:  Would you like me to proceed with that

1	then?

2	THE COURT:  Yes.

3	MS. LYNCH:  We did file a sentencing memorandum.

4	THE COURT:  I've seen it and I've read it.

5	MS. LYNCH:  So I'm going to be relatively brief.  I

6	know that's Your Honor's preference.  And Mr. Walker has

7	information that he would like you to be aware of that is not

8	contained in my brief.

9	I would point out -- I don't often hear, for the

10	most part, about my performance as an attorney.  We did

11	have -- we did have some issues in communication.  I think he

12	was understandably frustrated with my absence due to a head

13	injury that I had, followed immediately by the Covid shutdown.

14	Those were out of my control.  But as the Court knows, I

15	always do my best.  And I always do my best for you and

16	anything that we've had strife over because I was trying to do

17	what was best for you, and I hope that you understand that.

18	THE DEFENDANT:  Yes.

19	THE COURT:  I wanted to let you to know that.  Okay.

20	I'd like to focus on -- I'm sorry.  I penned the

21	perfect copy -- thank you.  That's going to be easier.

22	The factors for deviating from the guideline range,

23	which are contained on page -- the middle of page 5, factors 1

24	through 5 listed, Your Honor, I think it's important to note

25	that my client has been extraordinarily helpful throughout

this matter.  He's proffered not one time but three times, and that was both to assist the investigation on finding the information that was illegal on his electronic systems and also to try to identify other people committing the same sorts of crimes in order to identify further criminals and victims and/or other individuals committing these sorts of crime. Ultimately, those efforts did not produce anything that led to a conviction but it certainly did help educate the investigators with the complexities of the systems he was using.

He also offered on numerous occasions, and still offers today, to assist law enforcement investigators in continued educational endeavors to help find people in the future, to improve investigative methods, to teach them the complexities of these systems.  He did that almost immediately.  I can't recall the exact date.  Don't hold me to it, Ms. Preston.  I think it was within two weeks of his arrest that we were in the Henderson Detention Center and he was providing that cooperation.  It was voluminous proffers. I, myself, traveled to Indianapolis one time to meet with them.  I believe the third one was done by telephone because we were really in the height of the Covid pandemic.  So the timeliness was extraordinarily fast.

He was very -- his candor was more so than I've ever seen in any of my clients giving a proffer.  He was sincere

1  throughout in wanting to help law enforcement in general, not

2  just to help himself.  But I will note what I think is

3  particularly impactful to me, if not to the Court -- and I

4  hope it is -- when this Curt and he knew that his girlfriend

5  had found out that -- when he knew his goose was cooked, it

6  was several hours before law enforcement came to the home.  He

7  certainly could have ran and he didn't.  He certainly could

8  have destroyed evidence and he didn't.  He laid down on the

9  couch with a blanket and he waited; and when law enforcement

10 came to his home, he cooperated in every way, shape, and form

11 that he could have.  I've never really quite seen that.

12         And since Day 1, he has been very candid with me

13 about his remorse in this case and he's done what -- what he's

14 tried to do while he's in Henderson, to the best of his

15 ability, is to start addressing those issues again that led to

16 his criminal behavior.  And he recognizes that both the

17 traumas in his life led to substance abuse and horrible,

18 horrible, horrible decisions; and I think he's expressed to me

19 he's going to spend the rest of his life trying to make right.

20         So his cooperation was extraordinary.  And again,

21 he's willing to continue to cooperate if they want to use his

22 expertise.  Mr. Walker is a very, very intelligent man and I

23 think he has a lot of potential in the future, if he wants to

24 be of assistance to law enforcement.

25         I also want to note -- I did note in my memorandum a

1    couple of cases involving similarly situated defendants and
2    cases.  I cited one official case where the sentence was in
3    the ballpark of a 20-year sentence.  I noted two very high
4    profile cases for the purpose of noting that Mr. Taylor's
5    case, the subway co-defendant, and Eric Marquee case, they
6    both received sentences of 27 years.  Those are very high
7    profile cases that were highly scrutinized; and in those
8    cases, the Court determined that those were the appropriate --
9    the appropriate sentences.

10            Certainly in this court has great experience in
11   sentencing these types of matters.  I personally in one case,
12   State versus -- *U.S. v. Wells*, a young individual possessing
13   child pornography received an 18-month sentence to the
14   Volunteers of America program, which he successfully completed
15   but was found with more child pornography when he returned to
16   his home after his sentence was completed.  He ultimately was
17   sentenced on the new charges and -- I can't remember if it was
18   new charges or if it was a violation of his pretrial release.
19   In any event, he's serving -- currently serving a ten-year
20   sentence.

21            More recently, in *U.S. v. Dill*, which I believe the
22   facts are very similar to this case, inasmuch as Mr. Dill was
23   essentially blackmailing his mentally challenged stepdaughter
24   into having sexual activities with him and filming them and
25   then distributing them on the internet, in that case we

1   actually had a stipulated agreement with the government for a

2   period of 15 years.  If you recall the date of sentencing, he

3   cut off his pretrial release electronic bracelet.  Ultimately,

4   when he was apprehended, thankfully very quickly, this Court

5   did sentence him to 30 years.

6           So the big difference between those two cases, Wells

7   and Dill, in neither case did either defendant assist the

8   government in any way, shape, or form.  In fact, Mr. Dill made

9   it very, very difficult to convict him and his -- I believe in

10  Mr. Wells case, I think he did show appropriate remorse.  If

11  you recall, Mr. Dill was very indignant in the fact that he

12  was being convicted of anything at all.  In fact, if you

13  recall, tried to fire me in the middle of his plea hearing.

14          So Trent, again, has cooperated in ways I've never

15  seen a state or federal client cooperate.  I've never seen a

16  client be so determined and sincere and open and diligent in

17  trying to assist the government so that these things don't

18  ever happen again, and I would ask that you give him valuable

19  consideration for that.  And I think Trent, you have a

20  statement that you want to read?

21          THE DEFENDANT:  Yes, ma'am.

22          MS. LYNCH:  It's substantially the statement that I

23  read yesterday?  There's some changes?

24          THE DEFENDANT:  Yes, some minor changes.

25          MS. LYNCH:  Okay.  You can go ahead.  I'm giving you

1  the podium.

2          THE DEFENDANT:  Your Honor, I appreciate you for

3  allowing me the opportunity to address this Court, the

4  victims, and the family members associated with this case.

5  Everyone deserves an explanation and apology from me for my

6  actions.  I have thought about how I was going to express the

7  depth of my remorse and I struggled with even explaining how I

8  ended up in front of everyone today.

9          During my two years of pretrial detention, I've

10  self-reflected in anguish about what went terribly wrong in my

11  life and it's still difficult to relive and comprehend all of

12  it.  I hope sharing some reflections from the past two years

13  will help everyone understand my failures as a father, a

14  friend, and a person.  I will provide clarity for who I was,

15  the events that transpired before and during my terrible

16  actions, as well as the reasons behind my plans regarding the

17  rest of my life.

18          I wasn't disadvantaged as a child compared to most

19  and if anything, it was the opposite.  I had a better shot of

20  succeeding at life.

21          THE COURT REPORTER:  Could you slow down, please?

22          THE DEFENDANT:  Yes, ma'am.  I wasn't disadvantaged

23  as a child compared to most.  And if anything, it was the

24  opposite.  I had a better shot at succeeding in life.  Sadly,

25  as with most families, my parents divorced when I was young.

1    I can still vividly relive the feelings from the tension

2    caused from the fighting and bitterness, arguments over

3    parental time, more terribly the feeling caused from events

4    while home and parents being torn part.  That created a fear

5    of wanting children of my own.

6            Thankfully, my loving and brave mother, and now

7    stepfather, married.  Steve taught me what it was to be a true

8    father and how a household should be united and loving, helped

9    me conquer my fears of wanting to have my own family and guide

10   me towards developing a high standard of being a good provider

11   and father that I expected of myself.  I did not want children

12   if it meant they would experience what I had before and he

13   showed me a proper fatherhood.  All I wanted was what any good

14   father did.  I wanted to provide a stable -- or provide a

15   stability I didn't experience when I was a child.

16           Unfortunately, through the ages of three to five

17   years old, I was exploited and sexually abused by both

18   degenerative abusers and perpetrators.  As a result, that

19   created a hypersexuality which grew over numerous occasions

20   spanning many years.  It exposed me to a sexual exploitation

21   via unsettling hard-core activities before the age of ten from

22   those who were supposed to be trustworthy and caring.  They

23   were an immediate family member, relatives, and others.  One

24   of them even decided to share my sufferings and experiences

25   with others through online discussion, video, and picture

1  sharing.  As a victim of that abuse, I battled with the idea

2  of what were normal behaviors and ultimately, it was a big

3  source of my deviancy and improprieties later in life.

4        Honestly, while knowing much of their abuse wasn't

5  my fault, I still feel a crippling shame.  It was only much

6  later in life before I decided to share my pain and change by

7  talking about it at all.

8        At 18, I enlisted in the military and married

9  someone meaningful at the time with the hopes of starting that

10 family that I wanted.  I quickly realized in my military

11 career that having children while in was not something that I

12 wanted for them.  That was one of the main contributors to my

13 and her divorce.  I eventually met an amazing mother and

14 person named Nikki.  I tried to have a family with her a few

15 times; and again, my expectation of what a good partner and a

16 military father wasn't -- or a good partner while in the

17 military wasn't achievable.  This is in part due to my

18 immaturity, as well as not wanting my children to grow up in a

19 constantly changing environment.  They would miss out on

20 childhood friends and a supportive family.  Although I was

21 successful, I more importantly want to have a family of my

22 own.  My priorities changed after our relationship had failed

23 again.

24        So I chose to turn down my pending promotion to

25 Sergeant First Class, which would have required two additional

1    years of service, in order to get out and move back for an

2    opportunity to start life over.  In 2011, I was honorably

3    discharged after completing my obligation and moved in with

4    Michelle.  Both of the women that I've referenced so far are

5    the mothers of the minor victims.  We had been dating and felt

6    having a family was the best step forward.  She was pregnant

7    with ███████ three months later and we wed the following month.

8            I went from combat operations, instructing

9    intelligence operators, digital exploitation and network

10   analysis, to being what felt like an unimportant project

11   manager in the financial industry.  It was a 180 in my life.

12           MS. LYNCH:  I'm sorry, Your Honor.  You don't want

13   to say the victim's names because it is part of the record and

14   this will not be sealed, and that was one of your concerns is

15   that identifying information would be in the record.

16           THE DEFENDANT:  Yes.

17           MS. LYNCH:  So I missed that.  Sorry, judge.

18           THE DEFENDANT:  It was a complete 180 lifestyle

19   change that caused friction in our lives.  We began a path

20   that I feared earlier in my life with us arguing and starting

21   to tear our two children's lives apart.  We unsuccessfully

22   attempted to work out our issues and all we did was simply

23   argue, rather than fix our relationship.  I needed space.  So

24   I moved back into our old home.  I remained active in our

25   children's lives and tried to reconcile but ultimately,

1    divorce proceedings started six months after I moved out.

2         It was an impactful decision and I believe that that

3    was my major turning point in life.  I'd given up my military

4    career, my life, and everything I had accomplished for a

5    family I needed and ended up falling apart.  The divorce

6    shattered my person and soul.  I disconnected from reality and

7    became a workaholic.  The only person who pulled me out of

8    that empty place was my daughter.  However, that also altered

9    my life.  All I wanted to do was what was best for her.  I had

10   already failed her by putting her in the same situation that I

11   was in as a child.  That aided what existed in me and I was

12   self destructing, even where she became collateral and she

13   became a victim.

14        Thankfully, Michelle and I settled some differences

15   and became good co-parents and friends.  She saw my panics and

16   fears by not letting ███ see us bitter -- I'm sorry.  Pardon

17   me, sir.  By not letting our daughter see us bitter, as I saw

18   my parents was when I was young, and that was probably my

19   proudest post-divorce achievements with her.  My child support

20   was approximately $750 a month.  I almost tripled my income in

21   a few years by changing jobs in the area.  When necessary, I

22   desperately wanted to provide and be near her.  I was offered

23   many jobs elsewhere.  Yet all I wanted was to be in my family

24   and daughter's life.  No amount was more valuable than that.

25        At times a round trip to work and to see her was

approximately three and a half hours.  However long that felt,
it allowed me to stay active in her life.  It allowed me to
give her entertaining activities.  We would like to go
sledding, ice-skating, gardening, swimming, cooking, and other
activities.  We didn't stay home bored.

I burned out regardless of my intentions.  That
encouraged me to start a business and I took longer than
expected.  That exacerbated my perception of being a failure
and my mental state reflected just that.  I eventually
reconnected with Nikki and together we decided to have her
move into my home and have a -- excuse me, have a family with
the children that I had helped previously raise.  At this time
I'm not in the military.

It looked like a solution to bring me back to a
normal life from the darkness and terrible actions I had
already done.  Unfortunately, I behaved worse.  I feel like I
was too broken and I mistreated her even worse.  On top of
that, I expanded my abuse to another victim that I was chosen
to love and protect, her daughter.

Eventually I sought weekly treatment with a
therapist and psychologist at the VA to address my problems.
Some issues I wanted/needed help from are deeply rooted and
some are even more recent than that.  There were times when in
combat operations against terrorism and equally dark
organizations I was expected to execute, study and observe

1  unmentionable gut-wrenching activities that eventually

2  desensitized parts of me I wish had never been desensitized.

3  While I cannot and do not want to try and go over all of the

4  details of that, I am able to briefly explain some of the

5  details if you request, Your Honor.

6          I sought help from the VA and they ended up

7  diagnosing me with anxiety, PTSD, and major depressive and for

8  the first time in my life, I went on prescription mental

9  health medication.  After a year of trial and error, I don't

10  feel like it helped and if anything, I feel it contributed me

11  to becoming more deplorable.  I became more out of touch with

12  reality, lost all self control and lost all restraint.

13  Before, I felt like I had been hiding my abuse from the

14  victims and after the medication, I stopped trying to do that.

15          They became the addiction that I tried to correct

16  with the treatment that I had sought.  I went too far and I

17  needed to be caught.  Thankfully, God had put Nikki back in my

18  life and she handled a responsibility and burden that no one

19  should have been asked to do.  She was made aware of my

20  behavior, my infidelities and failures, and then to rightfully

21  take them to the authorities.  Ever since that day, I remind

22  myself how thankful I am she did.  No one deserves what I did.

23  She's measurably stronger and braver than I originally knew.

24          I was arrested the following day on county charges.

25  While I had the chance to flee, accepting my fate and having

 1   accountability to my children was more important.  Pardon me.

 2   It's more important in my recovery and acceptance for a better

 3   future.  After being arrested, I requested to speak to the FBI

 4   and have them involved.  Speaking to them opened the door to

 5   make this a federal case with potentially serving more time

 6   and additional charges, but I felt I could contribute on a

 7   larger scale to the problem in society facing, using my

 8   experiences, information and skill sets.  I proffered three or

 9   four times to the FBI, State Police and prosecutors, forensic

10   analysts and investigators.  I answered questions from the FBI

11   cyber crime headquarters, alongside the assistance of

12   providing my decryption keys to unbreakable devices and

13   storage, helping them navigate to unsuccessful parts of the

14   internet, and spoke of repurposing software I had created to

15   combat sexual offenses, eventually getting to the point of

16   discussing training material for the FBI.

17           I felt current future children deserve justice and

18   accountability from my actions and prevent future situations

19   if possible.  I wanted to do nothing but cooperate and accept

20   all responsibility.  I've caused an unbearable amount of

21   suffering and pain to everyone affected beyond those listed in

22   my case.  Those who publicly -- or those who are publicly

23   associated with me will forever be branded by my actions.

24           My friends lost part of their circle.  I, myself,

25   lost my best friend and my partner.  My family will never be

1  the same.  My own brother and sister do not want to be part of

2  my life.  My family of roughly 50 happy gather and support

3  each other and now I'm not even briefly mentioned in

4  conversation.  I've been lopped off all trees except for one,

5  that being my parents.  They're incredibly selfless and

6  loving.  My mother and stepfather are amazing examples of

7  parents I aspire to be, even though I took myself from them.

8         My conduct was completely out of character for the

9  person they knew and supported.  My blameless parents are now

10 associated with a soon to be felon, sex offender and inmate,

11 all of which are a first for my family and friends.  I hurt

12 and disappointed everyone.  My parents poured massive amounts

13 of love, time, and effort in raising me and now I can't offer

14 anything in return.

15        Recently my stepfather, Steve, broke his back and my

16 mother -- and had my mother by his side supporting him.  Since

17 returning back home, I've been adamant in helping my parents

18 in every way I could and it's killed me knowing that I wasn't

19 there to support either in future dilemmas, especially as both

20 they're aging and more prone to health concerns.  I'd do

21 anything for the opportunity to give back to them before it's

22 too late.  I couldn't bear to imagine the disappointment,

23 anguish from not being there when they will need it.

24        To the mothers of my victims.  I never meant to

25 betray or hurt you or our children.  I never intended for any

1  of this to ever have been possible.  My actions have tainted

2  your sense of security and trust.  I've hurt the children in

3  ways they don't even know yet.  I admired the idea of what a

4  good parent and role model should be.  I couldn't even stomach

5  reading the first page of my crimes and the prosecutor's

6  sentencing statement, and I'm the one that committed them.

7          After having read one Victim Impact Statement and

8  potentially hearing another one today, I can't imagine the

9  terrible situations I've put both of you in, let alone feel a

10  fraction of the emotions involved in being an advocate for the

11  victims but also survivors of abuse yourselves, as well as

12  mothers.  While some of the claims in the Victim Impact

13  Statement I don't entirely understand or agree with, it

14  doesn't matter because your feelings are valid and the impact

15  I had on those children and families is real.

16          I was in the wrong and I only wish the best for your

17  children.  I felt as a father at the most basic level I didn't

18  protect my family and I hurt everyone in it.  I'm truly sorry

19  for the pain and sorrow I caused and I will never forget that.

20  I thank God because they are fortunate to have great mothers

21  and are well beyond cared for.  They're outstanding and strong

22  parents and role models that will be there through the worst.

23          I also want to personally thank Jeff for stepping up

24  and being my daughter's father.  She needs and deserves a good

25  father.  I think the world of you and appreciate you or who

 1  you are to all of your children.

 2          To my children, I pray for your forgiveness one day.

 3  There's no way to undo the damage I've done to you.  I'm alone

 4  in despair and fault for the actions that I did.  The only

 5  thing I could have done was to be removed from the situation

 6  and find responsibility for my disgusting and horrendous

 7  actions.  I hope you never forget having parents who watch out

 8  for what's best for you in your lives.  Share with them and

 9  being close to them will allow them to always be there to

10  help.  If they don't know something's happening, they can't

11  help.  Trust them as they love you and will protect you as

12  good parents should.  Don't let my failures hurt their love

13  and trust.

14          To the victims of online abuse and exploitation, I'm

15  equally sorry.  While I never sought out or preyed on victims

16  beyond my immediate two, I did associate with those who did

17  online.  I contributed and perpetuated society's issue and

18  problem.  I understand I hurt people with my actions and

19  apologize, for the exploitation and sexual abuse is a bigger

20  issue than I originally knew.  While I can't fix all of

21  society, I'm starting with myself and I appreciate developing

22  tools and techniques to combat that exploitation.

23          I agreed to the plea offer to distance myself from

24  causing suffering more so than I have.  Considerably, the

25  government granted me my most important request, which was

allowing me contact with the victims' families, if they
contacted me first, and the same for the victims at the age of
18.  I pray daily for reconciliation and forgiveness and can
only hope to have contact if the situation allows.  That was
by far the most important concession I requested.

          I hope my guilty plea and proffers are evidence of
my remorse and acceptance of responsibility for my criminal
conduct.  I wish I could go back and do things differently; to
not hurt anyone, to not lose my family, my loved ones and my
children but that's impossible.  I can only hope that those in
my life, my victims and their families, get closure from my
acceptance and my existence; and if reaching out helps to
heal, any unanswered questions or anything else, never
hesitate.  I can only look to being available if that day
comes.

          Since being detained, I've done a considerable
amount of self reflection to try to best change my life and
seek a healthy lifestyle and a new purpose.  I have used all
resources and programs available to me to better myself and
those around me.  I've invested time into those who wanted
their GEDs, assisted in Bible studies and other improvements.
I, myself, did the 12-step recovery program and Bible studies,
which were the only options currently available to me.  I've
worked hard to grow spiritually and will continue to do so to
seek forgiveness and salvation.  While I understand that faith

1   is not a cure-all, mental and spiritual accountability through

2   faith would have helped me during my tough times.

3          Early in pretrial detention I requested a mental

4   evaluation and was sent to Lexington, Kentucky.  I met with

5   many individuals who were sentenced to life.  They're living

6   with zero purpose while being warehoused and simply waiting to

7   die.  Nine people died during Covid before I left Lexington.

8   In one case, a man named Dan had died next to me without a

9   moment's notice.  I fear becoming another Dan.  At the start

10  of the Covid pandemic, I fell ill to it and suffered four

11  months before being fortunate enough to recover, though

12  recovery took awhile.  It was terrifying to the point where

13  one night I wasn't so sure that I would wake up the following

14  day.  So I wrote a final statement for someone to read if I

15  did end up passing.  While I understand I'll be incarcerated

16  because of my actions, I still deserve to survive and use my

17  experiences in the free world.

18          I look forward to learning new skills and earning

19  degrees while in prison, such as culinary arts.  I'd also like

20  to attend therapy and sex offender treatment programs to work

21  on myself and my reason for bringing myself where I am today.

22  I'm looking forward to contributing to society in a productive

23  way to make a real difference in the world.  And in addition

24  to my assistance to the FBI, I have a plan to help combat

25  online exploitation and child pornography.  Hopefully I have

1   not squandered every opportunity in that regard.  I would

2   appreciate being able to atone for my sins and crimes by only

3   helpful means available.  I look forward to curbing the issues

4   that I once contributed to.

5          Judge, I have single-handedly destroyed my life, my

6   family, my career, and my relationships.  There is no doubt I

7   will pay the punishment.  At least I know -- or at least know

8   I led a law-abiding life for 30 years prior to my last six

9   years' downfall.  I've always had stable employment since I

10  was 12.  I showed my commitment to my family by being a

11  provider and attending over 200 college hours.  I had multiple

12  disciplines and spending much time volunteering in my

13  community.  I respectfully served eight years in the military

14  while maintaining a top secret security clearance.

15         My character is more than my worst behavior.  I am

16  salvageable and not a lost cause.  I spent a great deal of

17  time trying to decide on an adequate and appropriate sentence

18  and punishment for my crimes, their impact on the community.

19  Over time that answer has changed and yet I still don't have a

20  sufficient answer.  I do know my children will never forget.

21  I hope those that find their forgiveness with me and

22  themselves, as at times we blame ourselves.  Deplore what I

23  did but please don't hate me.  Please don't live with hate in

24  your heart for the rest of your lives.  I wouldn't wish that

25  for anyone.  I can carry that on for you myself.

1    I can say if released sooner than later, I would
2  never walk this path again.  However, I'll accept the
3  punishment my crimes deserve.  And time no parole, as you
4  mentioned before, I will serve my sentence.  A sentence of 15
5  to 30 years would almost make me 60 upon release from prison.
6  A lifetime supervision would prevent me from causing harm
7  while deterring others from similar crimes.  It would also
8  allow me to be placed in Marion, Illinois, setting me up to
9  attend that sex offender treatment program and remain local,
10 allowing me the chance to repair any relationships with my
11 family and loved ones, who all would be within a three-hour
12 drive from me.
13    Most importantly, I would still have a family left
14 upon release.  A sentencing any greater would fill and be a
15 life sentence, putting me closer to 70, at which time my
16 victims would be in their 40's, potential grandchildren in
17 their 20's and great children being born.  If they decide to
18 involve me in their lives, that punishment would span four
19 generations, leaving me parentless and possibly without
20 siblings.  Especially given that incarcerated males' life
21 expectancies is in the early 70's, I would be anything but a
22 husk of a person at that point.  In case my sentence is more
23 than that, I would have less of a chance to communicate and be
24 with my family, as I would not be able to attend the SOT
25 program close to home.

1        Nothing I can do can alleviate the suffering I've

2   caused.  The sentence will not heal the harm that I caused.

3   And while I understand lengthy punishment ahead of me, I plead

4   for a sentence that is not greater than necessary but

5   sufficient to balance the security -- the severity of all

6   factors in my case.  I would never dismiss the seriousness of

7   my crimes, as they are just that.  Yet the guidelines are life

8   ending.

9        I also know that my cooperation, acceptance, and

10  proffering will never absolve me.  I simply request they help

11  you in determining and allowing me a life outside of prison.

12  A lifetime of supervision would be more than sufficient to

13  keep the public safe and keeping me on the right track.  I beg

14  for leniency and forgiveness.  I am sorry for placing this

15  burden on you, as I know firsthand what it means and feel like

16  to potentially take a man's life due to your obligations.

17        No matter the length of the sentence, I request a

18  facility with a sex offender treatment program so I can attend

19  and participate in therapy and rehabilitation for myself and

20  society rather than simply being warehoused.  This will allow

21  me to focus on getting better as an individual.  If I receive

22  a medium-risk sentence, I request once again to go to Marion,

23  Illinois, so I can reconcile with my family.  A longer

24  sentence requiring a high-risk facility, I request to go to

25  Tucson, Arizona, as it is the only high-risk facility with a

1   sex offender treatment program that the BOP offers.

2          I simply want programming, therapy, and assistance

3   to better integrate to society.  I'm not experiencing a life

4   where people are dependent on drugs to cope and become

5   crippled.  This is the most I've seen in life when it comes to

6   those activities.  I don't have any interest in it and simply

7   want to be able to appreciate life again and not waste it.

8          Again, I apologize for reopening all these wounds

9   that I've caused.  I can only hope we find closure from my

10  chapter in your lives so that you all may move forward.

11  Throughout this experience I've learned the pursuit of truth

12  and honesty is the only way to live free in this world.  I had

13  a problem and take it seriously.  I am ashamed and

14  disappointed in who I've become.  Childhood in me would be

15  more disappointed as I believe -- excuse me, as I have become

16  one of the monsters he feared most.  God willing allow me to

17  do better, I will be better.  Thank you, sir.

18          THE COURT:  Thank you, Mr. Walker.  Anything else,

19  Ms. Lynch?

20          MS. LYNCH:  I thought it would be better if you hear

21  those things from him rather than me and I have nothing

22  further to add.

23          THE COURT:  Thank you.  You can have a seat.

24  Ms. Preston, on behalf of the government?

25          MS. PRESTON:  Your Honor, we do have victims who

```
 1   wish to address the Court.  So I can address the Court first
 2   or allow them the opportunity to address you, Your Honor.
 3              THE COURT:  We've been going about an hour or so.
 4   Does anybody need a break?
 5              MS. PRESTON:  I'm fine, Your Honor.
 6              MS. LYNCH:  I'm fine.
 7              THE COURT:  We can continue.
 8              MS. PRESTON:  Your Honor, would you like to hear
 9   from me first or from the victims?
10              THE COURT:  It's up to you.
11              MS. BROWN:  Good afternoon, Judge Young.
12              THE COURT:  Good afternoon.
13              MS. BROWN:  My name is Mary Michelle Brown.
14              THE COURT:  You're going to have to speak up a
15   little bit.  Okay?
16              MS. BROWN:  Yes, sir.
17              THE COURT:  Maybe you can pull that a little closer
18   to you.
19              MS. BROWN:  That would be great.  I didn't know if I
20   was allowed.  Sorry.
21              THE COURT:  There you go.  That's better.
22              MS. BROWN:  My name is Mary Michelle and I
23   respectfully come forth as the mother of victim No. 1.  She is
24   my daughter ████, formerly known to be Trent's daughter.
25   Although there is no way I would subject ████ to being in the
```

1 presence of her abuser, I like that her voice in this matter

2 is very relevant.  And so I've just brought some photos to

3 signify her presence and I just want you to know some things

4 about her beyond what he did to her.  Okay?

5            THE COURT:  Okay.

6            MS. BROWN:  So if you don't mind.  This is ▮▮▮▮▮

7 most recent school picture and she's in the fourth grade now

8 and she just turned nine in June.  So she's growing up fast.

9 It's been two years since all of this was discovered and a lot

10 has happened in that two years but -- and this is a picture

11 that she painted for us that I just really thought that she

12 did a great job on.  Like so many other kids, she has a lot of

13 dreams and aspirations in her life but she aspires to be an

14 artist when she grows up.  So I was really proud of this

15 picture that she made me and brought home.

16            Our family always does something special for the

17 kids on their birthday and this year was actually a pretty

18 special year for ▮▮▮▮.  She's gotten involved in softball and

19 made lots of friends.  She wanted to have a tie dye swim party

20 for her birthday.  So we invited all of her friends over and

21 they made tie dye shirts, ate tacos, snow cones, swam and just

22 had a really great time.  Nicole here, she made ▮▮▮▮ a

23 beautiful two-tiered tie-dye cake.  And you know, we've thrown

24 lots of birthday parties but there was just something really

25 special about that day, just knowing everything that she has

1   been through and seeing her so happy that day.

2         You know, you take for granted as a parent sometimes

3   whenever your kids smile because that's what you're used to.

4   But there have been a lot of times over the past couple years

5   and prior to that I haven't seen her smile like we want to see

6   our children smiling.  So it was a very emotional day on her

7   birthday just seeing that again.  It brought good feelings.

8         ███████ favorite colors are, as one would expect

9   from most little girls, pink, aqua, lavender.  She's very

10  bright.  Gymnastics is her all-time favorite sport and you

11  would think that a child who has been through the things that

12  ██████ has been through would be very timid.  She is fearless

13  and very gifted and that really shows in her gymnastics.

14        She dreams of owning her very own horse one day but

15  for now she's got a golden doodle named Penelope.  She named

16  Penelope because she's a copper color, kind of like a penny.

17  Very cute dog.  But they became very good friends.  Penelope

18  was given to ██████ about two years ago and has intended her

19  purpose as an emotional support animal, and she sleeps in

20  ███████ room every night and, you know, it's really helped a

21  lot.

22        ██████████ favorite snacks, like so many children, you

23  know, she likes the Goldfish crackers, Chick-filet-A.  Loves

24  Chick-filet-A.  And we go to Gatlinburg every so often.  She

25  loves the mountains but, you know, the beach is definitely

where she belongs.  That's her favorite place.  And she tells

me she wants her very own Barbie dream house on the beach when

she grows up.  She really reminds me a lot of me, you know.

But you know, more so than anything, ███ is

just -- she's very soft-hearted, enthusiastic and very well

dispositioned.  She demonstrates kindness and empathy towards

others with little to no regard for whether or not it's truly

deserved.  She's a fine mixture of prissy and tomboy, you

know.  She's very pretty and she's very stylish but she loves

riding her dirt bike, which she calls the *death machine* in her

little tomboy way.

She does attend therapy on a regular basis and when

her therapist asked who she looks up to more than anyone else

in the world, her answer was me, her mom.

This is our family.  It's my husband, ███, myself

and our four children now.  I am truly obliged to have the

opportunity to appear before you on ███ behalf, but I feel

it's only fair for me to be transparent about how embarrassed

and ashamed I am to do so under circumstances which associate

our family with a person like Trent.  When I was tasked with

formulating a Victim Impact Statement on ███ behalf, I

really -- I expected it to be an easy thing.  Not so much easy

to think about but just easy to have the words to tell you;

and you know, truthfully, it would be easier for me to explain

the ways that this hasn't impacted ███ versus the ways in

1  which it actually has impacted her.

2          You know, as a judge, you may sometimes read through

3  these cases and the details of what people have done and find

4  yourself wondering how common, law-abiding citizens manage to

5  get entangled with people like Trent and end up in your

6  courtroom talking with you like I am now; and I've actually

7  found myself reflecting on the past wondering the same thing.

8  You know, I'm a college graduate.  I'm a mortgage loan officer

9  and I've been with the same company for 17 years.  I've got

10 four children total; three little girls ages three, five and

11 nine.  My son is 14 years old.  I don't consider myself naive.

12 I do consider myself a good parent and I'm generally very

13 guarded, especially given that, you know, I, myself, as a

14 young child, was a victim of sexual abuse.  Of course, nothing

15 to the extent which ███████ has been.  I wouldn't even make the

16 comparison, to be perfectly honest with you.  But still, you

17 know, I take my responsibility as a parent and as a mother

18 very seriously, as does my husband.  We both work very hard to

19 protect and provide for our kids.

20          But I've known Trent and his family since I was 14.

21 Trent and I grew up together riding bikes in the same

22 neighborhood and we graduated from the same school before he

23 went off to the Army.  He had his stint in the Army and our

24 communication was hit or miss but still, I always thought

25 highly of Trent from the time we were young.

1         He was in the Army for about eight years and we

2    married a few months after he was discharged.  We had been

3    dating during his last stretch in the Army.  I can't recall

4    for how long but I really felt like I knew him.  I knew him

5    before he left.  We reconnected while he was in.  We married

6    whenever he got out and it seemed right at the time.  ████

7    was born about eight months after I married Trent.  And this

8    is  ████  picture from the hospital; and you'll notice in

9    this picture, Trent is holding her at the hospital like any

10   father would be holding their baby girl.

11        I filed to divorce Trent a little over one year into

12   our marriage and  ████  was only nine months old at the time

13   but it just didn't take me long to realize that he was not the

14   boy I grew up with.  He definitely did not come across as the

15   man I thought I married.  He demonstrated on numerous

16   occasions that he was not a safe, stable parental figure.

17   Although there were no signs of him being a sexual predator,

18   he drank alcohol excessively and was physically and verbally

19   abusive towards me on many occasions.  On one occasion, he

20   made a threat with a gun.  And  ████  was only an infant when

21   he was neglectful towards her and endangered her life during

22   one of his drunken, erratic outbursts.

23        Anytime I'm in a courtroom, I remember those divorce

24   custody hearings that I had to fight through to try to keep

25   ████  with me as much as possible so she could be as safe as

1  possible.  He was seeking split physical custody of ███ at

2  the time; and based upon his past behavior, I was gravely

3  concerned that it was not the best thing for ███.  Driving

4  under the influence in the car, maybe rolling over upon her

5  while asleep, not keeping his firearms locked away are just a

6  few fears I had.  Definitely nothing pertaining to the charges

7  that have been brought against him in this case.

8         But against my wishes, his visitation was

9  unsupervised when our divorce was final.  In November of 2013,

10  and ███ was about one and a half years old at the time, and

11  this was her asleep in her car seat just a baby.  Just a baby

12  at this time.  I worried about ███ but I -- I really just

13  was left with no choice but to give Trent the benefit of the

14  doubt and hope that he would be a good father.  He had told me

15  so many times how being a parent was something that he looked

16  forward to, although his actions demonstrated he did a very

17  poor job.

18         I am very blessed to know what it means to have an

19  extraordinary father and he has spent his life teaching me

20  what good fathers do.  I'm sure you can relate.

21         I mentioned our divorce was final in November of

22  2013, and physical evidence of Trent assaulting ███ dates

23  back as far as December 24th of 2013.  Just one month post

24  divorce.  And she was only one year six months old, still

25  wearing a diaper.  You see her in this picture about that

 1  time.   It was Christmastime and she was enjoying some cookies

 2  that her older brother and I made at our home.  And anyway,

 3  she was just -- she was so special and outgoing, even as a

 4  baby.  I remember -- you know how they are at that age.

 5  They're still wearing their cute little Christmas pajamas and

 6  they rely on you for everything they need and require.  They

 7  need their momma.  They need their daddy.  And they have to be

 8  able to trust the hands they're in.  They have no choice.

 9        Although I have not seen the footage from

10  December 24th of 2013, it's my understanding that Trent

11  stripped off her clothing, removed her diaper, sprawled her

12  out, bound her to a board, and mercilessly assaulted her with

13  a tool as she screamed and cried helplessly.  I remember that

14  Christmas very well because I had never spent a Christmas

15  without █████.  I was at my home.  Of course I was missing her

16  terribly but I stayed busy most of that night wrapping gifts

17  at the table, preparing food for the next day; and as hard as

18  it was being without her, I had no choice but to find comfort

19  in believing that she was just like any other baby swaddled up

20  in her bed waiting for Santa Claus to visit her.  I had no

21  idea that she was being sexually tormented and perhaps

22  enduring some of the worst physical pain she had ever felt in

23  all of her life, all of which was inflicted upon her by her

24  so-called father.

25        As █████ has grown up, you know, and I reflect, I

know there were signs of trouble and I do have some perception

of how the abuse impacted ███ at the time it was happening.

One thing that it's very important to understand is that Trent

is a master manipulator.  I've known him for enough years to

know that much.  He is supremely guileful, deceptive, with an

uncanny ability to conceal what he does not want others to

know.  And his method mainly involved playing on the emotions

of other people to find a way to make them feel accountable

for something that's happened.  Not only did he utilize his

parental authority to instill fear in ███ as he abused and

exploited her, but he used his co-parenting power and parental

rights to distance and to place blame upon me.

          Looking back, it's evident the abuse ███ was

subject to impacted nearly every aspect of her life.  I mean,

her sleep habits, her performance in school, her trust in

others, her emotional stability, self-esteem, and even her

self image were noticeably impacted as this abuse went on

throughout her childhood.  It was hard being ███.  It still

is; but especially before she could tell anyone what was going

on.  It was very hard being ███.

          I mean, she was scolded for her lack of attention

during class and at homework time.  Her MAP testing scores

were significantly below average.  I would be doing her

homework with her and I could see her trying so hard to focus

because she wanted to be proud of herself.  She wanted to make

1  me proud but, you know, she just couldn't focus.  It was hard.

2  And I don't even think ███ understood why it was happening

3  at the time.  She just struggled.

4       Her teachers insinuated that she had a learning

5  disability and they would revoke special privileges other kids

6  still enjoyed whenever ███ did not meet their expectations.

7  There were a couple of teachers who actually recommended she

8  be held back for a grade for further instruction, although I

9  never stood for it.  ███ would come home from school and I

10 mean, it would just be all over her face how inadequate she

11 felt and how defeated she was after just sitting through

12 school like a normal kid.

13      Trent often blamed me for her shortcomings and it

14 was silly stuff, like I wasn't devoting sufficient time to her

15 studies or maybe I wasn't effectively communicating with

16 teachers, and that's false.  I mean, I communicate with people

17 for a living.  I stay on the phone with people from all over

18 the country for at least eight hours a day communicating.

19 It's what I do.  Of course I can communicate.  It was just

20 jargon, you know, bedtime not early enough.  Any excuse he

21 could make.

22      I knew I was meeting my parental obligations and

23 then some, but it really pained me to see ███ hurt and

24 struggle and to feel bad about herself.  But his accusations

25 were his way of diverting the blame.  Nonetheless, I still

1  tried harder to help ▆▆▆▆ succeed.

2          Unbeknownst to me, ▆▆▆▆ was struggling largely

3  because she was traumatized and being kept awake through the

4  night by Trent, who was forcing her to engage in repulsive

5  sexual acts.  ▆▆▆▆ has since shared with me that Trent would

6  creep into her room at all hours of the night, start rubbing

7  on her genitals to awaken her and ask if she was ready to do

8  their secret.  That's what he called these things was their

9  secret.

10          She told me she did not want to do it but was often

11  forced to go along with whatever he wanted and I don't know

12  what it feels like to be ▆▆▆▆.  I've never -- I've never

13  endured anything like what she has endured, but I can't

14  conceive how scared she must have felt as she laid in her bed

15  wondering if he was going to walk in and fearing for what he

16  might do when he did walk in.  As I'm sure you're aware, it

17  wasn't pleasant.

18          I cannot fathom how she must have felt sitting in

19  class counting the days or the minutes left until he would

20  take possession of her.  And that was always something I

21  noticed whenever he would drop her off at home or we would

22  meet in town and he would drop her off to return her to me

23  from his parenting visit.  He would get down to her level and

24  look her in the face and say:  Three more days, or however

25  many more days it was, as to let her know he would be back.

1  It was just another subtle way that he manipulated her and

2  kept her under his thumb, and that's what people like Trent

3  do.

4          It was just impossible for her to manage the

5  workload of a normal child with what she was enduring at his

6  hands.  On top of dealing with all the things associated with

7  the abuse and the trauma, she also had to cope with being

8  labeled as a below average student who was a distraction to

9  the class.  I could see that ██████ was an intelligent little

10  girl.  So it really puzzled me that her performance in school

11  was sub-par.  Knowing what I know now, I feel extremely guilty

12  for being so critical of her at times and for expecting so

13  much from a child who had such a heavy cross to bear.

14          Without it, I have no doubt ██████ would have

15  exceeded her goals at school and beyond; and I know this

16  because she exceeds them now, despite the fact the abuse she

17  suffers still indeed lingers on in her everyday life.  You'll

18  be happy to know that ██████ has become an honor roll student

19  and her MAP test scores have drastically improved since Trent

20  has been removed from her circle.

21          ██████ sometimes cried and begged me to allow her to

22  stay at home rather than going to Trent's house, and this

23  really seemed to happen more often whenever he was single

24  without a girlfriend of some sort.  She usually seemed to feel

25  better visiting with him when he had a steady girlfriend, and

she was noticeably happier when Nicole and her daughters moved

into Trent's house.  To my knowledge, Nicole was the first and

only live-in girlfriend he had had since we split up and I was

very grateful for her.

Still, ████ sometimes asked to stay home.  And

every time, like any other mother, I questioned why.  I didn't

want to send her but I knew I could not refuse his parental

visits without just cause.  Of course, ████ reasons for

wanting to stay home always came up short because she feared

him too much to tell me the truth.  It was always something

along the lines of:  I'll miss you too much, or I'm bored at

daddy's house.  I just sit all weekend.  I don't get to do

things I get to do whenever I'm with you.

Trent would put on quite a show to hide the facts.

He sobbed, claiming his feelings were hurt and he complained

about not having the resources to provide the lavish lifestyle

████ enjoyed when she was with me and her stepfather at the

time.  Other times he went as far as to accuse me of

obstructing their relationship by brainwashing her into not

wanting to spend time with him.  In an effort to make ████

visits with Trent more bearable and to be an amicable

co-parent by the Court's definition, I spoke to ████ about

how much her daddy loved her and explained it would hurt his

heart if he thought she did not enjoy their time together.

Can you imagine, with what she was going through, hearing

those words come out of my mouth?

I reminded her we do not visit daddy expecting toys. That visits with dad are to spend quality time together.  I did send toys, movies, snacks, art supplies, and anything else ███ wanted from home praying she would end up having a good weekend.  I unknowingly and unwillfully put my little girl in the hands of an abusive parent, all while reassuring her she was going to have fun and that daddy loves her.

If you have daughters, you've probably been to a daddy/daughter dance or two, and I'll never forget ███ first daddy/daughter dance.  She was ready.  She had been talking about it for weeks.  I had ordered her a beautiful dress to wear and she was absolutely beaming with excitement up until the moment Trent arrived at our home to pick her up. She went from being this happy, bright, blissful kid who was ready to pick up and truck out the door to go to the dance, to being absolutely mortified.  And my husband and I were just -- we were so shocked because we just couldn't understand like what happened or why.  And she cried, begged for my husband to take her instead of Trent but she couldn't give me a reason for why she felt this way.

So I did pull her into my room and we kind of sat down and talked; and even with the two of us together alone, still I couldn't get her to budge.  So I walk into the living room and I find Trent crying, claiming to have no

1  understanding of why ▮▮▮ was so upset because he wanted

2  everyone to feel sorry for him; and honestly, I did feel sorry

3  for him.  My husband felt sorry for him.  But this was all a

4  part of his manipulation.

5          So after about an hour or so of negotiating, ▮▮▮▮

6  finally agreed to go to the dance but it was only because

7  Trent promised to bring her straight home afterward.  When she

8  got home, she clearly had a lot of fun at the dance and she

9  was in really good spirts but she still offered no explanation

10  as to why she was upset previously.  It's sad to me because as

11  a woman, you know, I look back at my own childhood and I

12  remember the awesome things that I got to do with my own dad

13  and my grandfather and fond memories.  And ▮▮▮, she has to

14  look back on those memories fearing her parent.

15          At times I noticed ▮▮▮ become more particular

16  about her appearance to a point she seemed critical of herself

17  and that -- you know, you kind of expect that out of a

18  teenager from time to time but from a little girl who's five,

19  six, seven years old, I mean, they're not supposed to care

20  what they really look like.  And I believe this stemmed from

21  Trent's abusive ways and his demands of her.

22          Prior to Trent's arrest, he accused me of failing to

23  teach ▮▮▮ proper feminine hygiene.  And of course, this was

24  absolutely appalling to me and I was shocked but still, I

25  couldn't help but ask what he was talking about.  So, you

know, he elaborated and he just told me that she was not

thoroughly cleaning.  So had a stench coming from her vaginal

area.  I found it odd he noticed this, as I've often helped

████ bathe whenever she was home with me, and I had never one

time noticed any stench.

        Again, he indicated I needed to take it upon myself

as her mother to help her improve upon her feminine hygiene.

Knowing ████ was a neat, clean child, I dismissed him but

still wondered how he would notice such a thing whenever I

couldn't notice.

        There were also times whenever I would notice

████ doctor's visits made her feel very uneasy.  She seemed

really nervous at the doctor and on the way to the doctor, and

would always want to know what the doctor would do during her

visit.  It usually wasn't as noticeable if she were going to

see a female doctor, and she did generally ask me who she was

going to see.

        But I recall her being at the doctor's office for a

urinary issue.  She wasn't undergoing a vaginal exam and was

clothed but she literally really jumped off the table when the

doctor's hands got close to her vaginal area while he was

feeling of her abdomen during her checkup.  She was very

frightened.  And you know, these victims, mine in particular,

my little girl, she had to partake in a forensic exam, if you

can imagine that at her age.

1          At the time that I took her for the exam, she did

2    not know that Trent had been arrested and she was not aware

3    she was being examined as a result of the abuse.  At the time,

4    she didn't realize I knew of the abuse.  And I went into

5    the -- St. Vincent's and had a discussion with the staff ahead

6    of time, before bringing ███ in, and I let them know that we

7    are not to refer to her as a victim.  That we are to treat her

8    like any other patient while doing what needed to be done as

9    to not traumatize her further.

10          But it was a very painful procedure and she was

11   scared to death.  She cried and begged me to make the doctor

12   stop.  And I knew that as a result of Trent's actions, ███

13   had just developed a general distrust and fear of people, even

14   those who may have good intentions and who are truly trying to

15   help her.  He worked really hard to conceal his crimes and to

16   silence ███ as these things were happening.  She suffered

17   alone and in silence almost all of her childhood up until he

18   was caught.

19          Public schools encourage parents to allow their

20   children to attend a good touch/bad touch lesson.  Because

21   Trent and I shared a joint legal custody, I had to notify him

22   and obtain his permission to allow ███ to participate.  I

23   remember suggesting it and him just being very casual and

24   nonchalant like:  Yeah, I don't really think that's necessary

25   for ███.  I mean, she doesn't really go anywhere.  She's

1  just with me and her grandparents.  I mean, she doesn't go

2  anywhere.  Home, school, that's it.  Why would we need to

3  burden her mind attending this class and even learning about

4  such things?

5          I did take it upon myself, although she did not go

6  to the class, just to sit down and explain touches to her, the

7  difference between a good touch and a bad touch.  And I asked

8  her if she had ever experienced a bad touch, and she told me

9  that she had not.  Once again, I can only assume that she did

10  not disclose the abuse because she was afraid of Trent.

11          Since Trent's arrest, ███ told me that she felt

12  like she was bad for allowing bad touches to happen to her.

13  It's caused her to feel ashamed of herself and it made her

14  feel like she was the bad person in this equation.

15          Disappearing panties were also an issue.  The

16  panties I sent in ███ weekend bag, as well as some other

17  common articles of clothing, did not always make it back home

18  from Trent's house.  And really, you kind of expect that.

19  Kids lose things.  But it seemed like I was always having to

20  buy her panties.  I finally brought it to Trent's attention

21  because it was just an ongoing problem, but I tried to do it

22  in a way to not make it embarrassing for him.  Honestly, I

23  pitied and felt sorry for him because he was unemployed and I

24  figured he could not afford to buy ███ clothes to keep at

25  his house.

He was somewhat defensive when I confronted him
about this and he downplayed it by saying things like:  My
gosh, Michelle, if you need some money for little girl
panties, I'll give you five or ten bucks next time I see you.
I don't know what happened to them.  They're probably in the
laundry or something.

So later, Nicole, Trent's girlfriend at the time he
was arrested, informed me that as she was going through his
private office after his arrest, she discovered some of
███████ unwashed panties tucked away in a manner that would
suggest that he had been selling them through the mail and
perhaps pleasuring himself with them.

Throughout ██████ childhood since the divorce, I
can honestly say that she was not the only person living in
fear.  I worried myself to death every time she left home.
I'm surprised my husband hasn't divorced me over it.  I would
just stay very stressed out while she would be gone.  It was
hard for me to enjoy our family's time together, my son and
our two younger girls, while ██████ was gone because I just
didn't feel like everything was right.  I just had a terrible
gut feeling that she wasn't okay but I couldn't prove it.

Still, despite the fact Trent and I had been through
a very nasty divorce, I befriended him because I wanted to be
more manageable of ██████ well-being and whereabouts while
she was away.  And although he was awarded unsupervised visits

1   and we had to be friends and co-parents, I routinely consulted

2   with attorneys to see if circumstances warranted a change.

3   From the time our divorce was final up until the day of his

4   arrest, I consulted with at least 13 different family law

5   attorneys.  Every time I was told the burden of proof was on

6   me and that I lacked sufficient evidence to warrant any

7   change.

8           Since the divorce had become final, legislation had

9   passed in favor of split physical custody and our county had a

10  newly appointed family court judge highly in favor of it.  The

11  lawyers, and even the staff at the county child support

12  office, told me Trent would likely be awarded more time with

13  ██████  if I pushed for unsupervised visits or even attempted to

14  collect on the thousands of dollars in child support

15  arrearages.  I decided not to push the issue in court for fear

16  it would result in ██████ being left in a more compromising

17  position having to spend more time with Trent than what

18  already ordered.

19          Since the child support division felt Trent was

20  willfully unemployed, they would not fulfill my request to

21  lower his child support at the time.  I went as far as to pay

22  a private attorney $500 to file an agreed order to lower

23  Trent's child support obligation, and I did this because I was

24  afraid he was going to fight the child support division with a

25  private attorney who would instill in his mind that he should

1  go ahead while he's in court and ask for more visits.

2        I remember the morning Nicole called me.  It was on

3  Sunday, August 11, 2019.  I was very surprised to hear from

4  her.  She said she had an urgent matter to discuss and needed

5  to meet in person away from my home.  I met her in a parking

6  lot about 15 minutes from my house and that's when she

7  tearfully told me she found photos on Trent's cell phone which

8  led her to believe that he had been molesting ███.  I was

9  floored at the accusation and I actually doubted her.

10        I wasn't willing to jump to any conclusions.  So I

11  demanded to see.  For all I knew, he could have done something

12  as innocent as taking a picture of a mosquito bite on her

13  bottom to send to the doctor to make sure it wasn't serious.

14  Like that's where my mind was.  I was so disgusted whenever I

15  saw what was on that phone, that I almost vomited in Nikki's

16  car; and of course, we took everything straight to the police.

17  But I can't tell you how excruciating it was to see my child

18  partaking in such acts.

19        I knew I had to maintain my composure.  Whenever I

20  went back home to my family, after we finished up with the

21  police, I settled down and I later told ███ that she would

22  no longer be going to Trent's house.  She wanted to know why.

23  I told her that he had been arrested for harming children.  I

24  didn't mention her name.  I just said *harming children*.

25        She was surprised and visibly relieved and she

shared with me some of the things that he did to her;
molestation, physical abuse, threats, guilting her about him
potentially going to jail if anyone ever found out about their
secret.  Him mixing his semen into her foods and beverages,
hoping she would come to like the taste of it and so be
willing to give him more oral sex.  Forcing her to wear
costume dresses and nightgowns and pose for photos and videos
while exposing her genitals.

She shared this information sporadically.  And as
she grew to understand just how wrong all of this was, she
began questioning the intentions of all of the people close to
her; me, my husband, her brother, her little sisters, her
grandparents, to a point she even questioned her own
intentions and wondered if she was a bad person or an unsafe
person for others to be around.  She worried herself to an
extreme level and still does at times.  I mean, the anxiety
that she feels and carries with her daily is immeasurable.

Upon finding out about this abuse, my first priority
was to ensure ███████ safety; but my second was to take action
to have Trent's parental rights revoked as quickly as
possible.  Even after everything he did, he still felt as
though he had the right to remain her father.  He refused to
relinquish his parental rights until my husband and I spent
approximately $10,000 in legal fees to push the matter in
court.  Even then, he tried to fight it claiming it was best

for him to remain as her father stating that there was so much

more to his relationship with █████ than these accusations.

It was sickening.  It was just absolutely sickening.  Finally

we resolved the matter and his rights were terminated.

         Although he is currently out of the picture and will

remain so, my concerns for █████ future know no bounds.  To

her credit, she has made great strides since having been

librated from Trent.  My husband Jeff took the role as her

true father right around the time she was one-year-old.  He

adopted her not long ago.  It was actually before Christmas of

2019.  So it was a pretty fast turnaround for the adoption

from the time he was incarcerated.

         █████ also has the love and the support of her

grandparents, even those from Trent's side of the family.  Her

teachers are now so proud of her tremendous growth in such

little time.  She has lots of friends who adore her, loves

gymnastics, running club, softball.  Still, she has a long,

difficult road ahead of her, especially with the abuse

occurring during her more formative years.  She aspires to do

and become so much.  I want her to and I encourage her to but

sometimes I fear that she may not.

         She's been attending psychotherapy regularly over

the past two years but remains extremely conflicted.  For the

longest time she felt responsible for Trent going to jail.

She blamed herself.  I mean, her heart is so big that for the

1   longest time she actually thought it was her fault that he was

2   in jail.  Her sleeping is interrupted by night terrors

3   stemming from the abuse.  I've witnessed her nearly jump out

4   of her seat for feeling so scared when a car resembling

5   Trent's passes us on the road.

6          Sometimes while at dinner, she will refuse to eat

7   certain foods because she thinks it looks like white stuff

8   daddies make in their penis and it grosses her out.  Just the

9   other day I was folding laundry in my room.  Actually, this

10  would have been a few months ago, since our last hearing was

11  postponed, but I was just folding the laundry and ███ was

12  sitting on the bed and she was in a bit of a gaze.  And I

13  looked at her and said:  What's the matter?  And she said:

14  That laundry basket reminds me of Trent.  And I'm over here

15  thinking:  What are you talking about?  So I said:  Well, do

16  you want to talk about it?

17         And she explained to me that the basket triggered

18  memories of Trent making her take off her clothes, lie down

19  naked on the bed, spread her legs to better expose her vagina,

20  force her to watch him masturbate while rubbing his penis on

21  her vagina before ejaculating all over her.  She said she

22  remembered him wiping her with a washcloth and throwing it

23  into a laundry basket when he finished.  So something as

24  simple and as innocent as doing the laundry triggers my little

25  girl to have these very disturbing thoughts and I know they

1   haunt her every day.

2          ██████████ thought process as it pertains to sex and

3   familial ties is very skewed.  There are times her words and

4   actions suggest she fears him but on occasion they suggest

5   that she actually misses him.  It's constantly waxing and

6   waning.  Probably because there are some normal

7   father/daughter memories entwined with this other sick stuff.

8   But I remember we were on vacation in Florida this past August

9   and ████████ comes up to me and says:  You know, mom, I think I'd

10  like to marry Trent when I grow up.  I was very confused.

11         She said she believes since he is no longer her dad,

12  it is not inappropriate for them to get married and that she

13  often fantasizes about and misses the sexual things they used

14  to do.  And this was during a time when I thought she was

15  doing better.  I can't imagine what it must be like living in

16  the mind of a child who is so confused and tainted due to

17  having been subject to this level of abuse nearly her entire

18  life, particularly as it involves a parent.

19         I ask myself what will puberty mean for ████████, now

20  that Trent has done these things to her.  Will she go on to

21  develop an alcohol or drug addiction?  What if this gets

22  around?  I mean, we live in a small town.  Owensboro is really

23  not that big.  I mean, we live in Whitesville.  What if it

24  gets around school during middle school or high school that

25  these things have happened to her, that her dad basically took

her virginity?

I wonder what it must be like to watch the news.  I mean, there are people who are doing these horrible things all the time.  His mug shot is out there on the internet because the news has it and they won't take it down, and she's going to be able to pull that news article up and read what he was charged with and know that he distributed her pictures; and then every time that somebody is on the news for being charged with something similar, she's going to have to wonder if that creep has come across her photos who has seen her.

Will she be more prone to having low self-esteem and have it further impact her education and future career at some point?  Will she be more apt to fall in the hands of abusers in the future because she was abused for so long that abuse feels normal to her?  Even if everything goes well for her throughout her teenage years, how will this abuse impact her wedding night and perhaps go on to impact the relationship she has with her own children?  Will she become suicidal at some point in her life?  What if one day she is sitting in a courtroom like this one in Trent's chair?

I want so much to believe none of this will happen but the statistics aren't in her favor, and the chances of her enduring all of which I just mentioned are exponentially greater than they would have been had she not been abused by Trent.  But now what's done is done and regardless of how

1 sorry anyone in this room is, it can't be taken back.

2   Her future will be polluted and colored by these

3 horrific encounters for the rest of her life.  Even with

4 routine therapy, there's no way to gauge the extent to which

5 she has been psychologically and emotionally impacted by the

6 things Trent did to her.  ████ family and I will provide

7 ongoing support but there's no promise her psychological and

8 emotional state will not worsen.

9   The past two years have shown life and the fact that

10 despite my greatest efforts, I still fall short of

11 understanding the magnitude of the situation as ████ sees it.

12 She's become so accustomed to having her feelings out of fear

13 and necessity, she could be drowning in a mental storm and no

14 one would know.  For ████, it's like being an actor who never

15 leaves the stage.  I'll never know all the thoughts and

16 feelings which lie behind the smile she wears.

17   At this point I believe ████ is struggling to

18 figure out who she is.  Not long ago, we were in the car

19 waiting in line at Chick-filet-A and she looked up at me from

20 the passenger seat and out of the blue said:  Mom, Trent has

21 ruined my life, hasn't he?  There's no way to describe the

22 pain in her expression.  And then she followed it up with:

23 I'm ruined, aren't I, mom?  I can't imagine how she must feel.

24 We talk about these things and we're hearing about these

25 things today but these things actually happened to her and

1   that's different.

2          It shatters my heart to know how bad ███ needed me

3   and that I couldn't save her.  I didn't even know my own child

4   but it's a lingering issue, you know.  I mean, it's -- it's on

5   my mind when I'm wrapping Christmas gifts, helping my children

6   bathing or even changing my toddler's diaper.  I can't even

7   stand seeing my own kids without their clothes because I have

8   flashbacks of this situation and it's very disturbing.  I get

9   sick all over again and it's just unfathomable to know that

10  someone has violated my child, or any child, in the manner in

11  which he did.  And I know that if it were not for Nicole

12  getting close enough to Trent to discover what he was doing,

13  it would still be happening not only to ███ but to other

14  children he's had a hand in hurting, whether it be through the

15  internet or by other means.

16          I thank God every day ███ is still alive because I

17  believe people who are as sadistic as Trent have been known to

18  get lost in the heat of the moment and even kill their victims

19  before they, themselves, even realize what they've done.

20          The day that Trent lost his parental rights over

21  ███ was one of the best days of my life but it still doesn't

22  change what has happened and the fact that the effects will

23  forever linger on in her life.  With all of that being said, I

24  believe hope is a very powerful force and when all of this

25  came about, I made myself a promise to say close to my faith

1  and remain committed to ███████ recovery before anything else,

2  to never lose hope.  As parents, we want to see our children

3  be healthy, happy and have all of what they need and most of

4  what they want.  Despite the horrific treatment ██████ has been

5  subject to, I do not intend for her to have less than all of

6  the wonderful things she deserves in her life.

7        Before I was aware of this abuse, I envisioned

8  ████████ future.  Would she make the cheerleading team, have

9  close friends and graduate at the top of her class?  Would she

10 become a doctor and save the lives of others?  Would she be a

11 judge or an attorney who defends those who are most

12 vulnerable?  Would she become a teacher who wields confidence

13 in her students and spreads warmth and cheer in the classroom?

14 Would she marry her high school sweetheart and become a loving

15 mother?

16       I no longer focus on any of those things.  Now I

17 take it day-by-day and my questions are:  Is ██████ really

18 happy?  Is █████ really okay?  Because I can't look at her and

19 tell.  I never have been able to look at her and tell and this

20 situation is proof of that.

21       As mentioned many times throughout my statement,

22 ███████ mental state as it pertains to this matter is very

23 delicate.  My biggest fear is that Trent will some day be

24 allowed to have contact with ██████ or will be released from

25 prison at some point during her natural life.  I believe this

would be utterly petrifying for her and unravel any progress

she makes as she matures.  She should never have to live in a

world where she must fear falling victim to him again.

My hope for ██████ is that she will flourish in every

way as she lives her life but the groundwork must be set in a

manner making it possible.  Trent being allowed to walk free

is not a part of that groundwork.  As closure is brought to

this case, I want to express my utmost gratitude for everyone

who's had a hand in bringing Trent to justice.  Whether or not

we realize it, we are all Trent's victims to a lesser or

greater extent.  No one here and no one who has worked this

case or who had a hand in ██████ adoption process will ever

forget these gruesome facts.  His acts were known to everyone

involved for the rest of their lives and the children who were

victimized will indeed be agonized by his abuse for the rest

of theirs.  In a sense, Trent's victims, these innocent

children, have received a life sentence.

I hope you find it is right and just to make sure

Trent's decision to commit these crimes over and over again

follows him for the rest of his life.  It seems like he's very

content where he is.  It seems like he's making progress and

he can make a difference in the way he wants to make a

difference from behind bars more so than he could out in the

community because he's already among those most like him.

On the behalf of my daughter ██████, I respectfully

1  and prayerfully ask that you exercise your noble judgment and

2  mightiness to ensure Trent can never bestow harm upon another

3  child.  ████, ████, Nicole's daughter, and all the children

4  who have not yet to be identified are counting on your saving

5  grace.

6          I have just one final picture to share with you.

7  This one is ████ and ████, Nicole's little girl, playing in

8  our pool over the summer.  To this day they are best friends

9  and hold each other near and dear.

10         Thank you for your time in allowing me to speak on

11 my daughter's behalf today and I hope you keep ████ in the

12 forefront of your mind as you decide what's fair in

13 sentencing.

14         THE COURT:  Thank you for your statement.

15         MS. BESHEAR:  Good afternoon, judge.  Evening as

16 we're coming on it.  It's been a long day for all of us and

17 I'll try to keep brief but I appreciate your time in

18 understanding the circumstances.

19         My name is Nicole Beshear.  Oh.  I apologize.  Thank

20 you.  My name is Nicole Beshear.  I am victim No. 2 or ████'s

21 mom.  This has been a difficult circumstance for all of us but

22 it's been particularly difficult for me, given that ████ is

23 not just my ex-boyfriend's daughter, she has -- she's been the

24 child in my heart ever since I knew she existed, even though

25 he and I weren't together at the time.  In large part, just

1  because she was his, I loved him, I loved her.  And when we

2  did reconcile again and we came together again, I got to know

3  ███.  Got to see what a wonderful and amazing child that she

4  is and introduced her to my daughter and they became -- they

5  still call each other sisters.  They couldn't be closer.

6  They're as different as night as day but they're both

7  beautiful, amazing little girls.

8          Trent presented himself in such a way that his past,

9  he was very apologetic.  Had made a lot of changes in his life

10 that -- he assured me that the issues we'd had in the past

11 wouldn't be a problem in the future, and we did have our fair

12 share of issues, things I was concerned about and I was

13 hesitant.  But over the course of time, he won me over and I

14 believed in him.

15         And then there's ███ and she's just impossible not

16 to love.  ███ and I share a very special bond and it's an

17 unfortunate bond.  Michelle has a lot of questions about

18 ███ future and she comes to me daily with questions about

19 ███ behavior because I'm in a unique position to

20 understand where ███ coming from and what she's going

21 through.  I, myself, from my earliest memories was a victim of

22 sexual abuse, various abuse from my grandfather, up until age

23 eight, at which time I told my mother what was going on.

24         In ███ instance, she has been spared some of the

25 things I wasn't.  I did have to go to court and stand up and

1   testify and send my grandfather to prison for the rest of his

2   life.  In this instance, Michelle and I are here to stand up

3   for ▆▆▆▆ and for ▆▆▆▆.  It's easy to kind of overlook ▆▆▆▆ in

4   a lot of the circumstances because of what happened to ▆▆▆▆

5   was so atrocious and occurred for such an extended period of

6   time.

7           But I know the things that Michelle's worried about,

8   the nightmares that ▆▆▆▆ already enduring, the therapy, the

9   triggers, the mistrust, the questions about going into puberty

10  and becoming an adult, all of those things I can tell her:

11  Yeah, it happens.  It's part of how I ended up with Trent in

12  the first place was my view of love, my view of what was okay,

13  my view of appropriate relationships has been skewed and

14  warped by what I endured by the same types of things that

15  ▆▆▆▆ endured, and it's not an easy road.

16          Unfortunately, my family was not able to support me

17  through my journey; but ▆▆▆▆ has us and I have hopes that she

18  will be able to navigate this better than I have.  That she

19  won't end up in the same situations that I have.  But

20  unfortunately, that's not a certainty.  The certainty is this

21  happened.  The certainty is she is suffering.  The certainty

22  is that she will never forget this.  It will always be there

23  every day just a thought away.

24          Michelle was talking about the triggers, the laundry

25  basket.  And I can tell you being in this courtroom again,

flashbacks.  It's not knowing where you are.  It's -- there

was one night Trent walked into our living room carrying a can

of Coca Cola.  Completely innocuous thing.  And I was stunned.

I was in a moment where I was no longer there.  And █████████

already experiencing those things and she will continue to.

We can get her the therapy.  We can get her the tools to cope

with it but it will never stop it and she will live with this

for the rest of her life.  She will endure this sentence that

he has imposed upon her for the rest of her life.  And I can

continue on talking about all this about ██████ but I do want

to take a few moments to talk about ██████.

I'm a very different mom than Michelle but in a lot

of ways, when it comes to our children, we're just identical.

We're fierce.  We're protective.  We're observant.  I'm

particularly observant because of what I did go through and I

looked.  I listened.  When the girls were in the other room

playing, were they playing appropriately?  Were the pictures

they were drawing appropriate?  Were there any signs of

anything to be concerned about?  And it wasn't because I felt

like there might be.  It's because there could have been.

My mother had no idea.  My family had no idea.  I

suffered in silence and I never wanted to miss a clue.  I

never wanted to miss anything.  And the fact that I did, the

fact that this went on with someone who I thought I knew, I

thought I could trust, there's a level of guilt that you

1   can't -- it will always be there.  It will never go away.  I

2   failed my children.

3               ████ is an amazing girl.  She is the mediator.  She

4   is the counselor.  She is the heart of every group that she's

5   in.  She doesn't have a mean bone in her body and she wants to

6   be a child therapist when she grows up because she knows that

7   there are children out there who have been through difficult

8   times.  She knows sometimes it's hard for people to talk and

9   she likes to make people feel better.  She's also recently

10  indicated she wants to be a lawyer, which I'm very proud of on

11  both accounts, but it was new.  So I asked her why and she

12  said:  Mom, there's a lot of people out there who do a lot of

13  bad things and there's people out there who need somebody to

14  stand up for them.  And she said:  I'm really good at

15  listening and I'm really good at figuring things out and I'm

16  very fair.  And I told her:  I can't think of any better

17  reason.

18              She loves Doctor Who.  It's her favorite.  And she

19  just recently took up soccer, which is really unusual because

20  she's not a sporty kid, and she's learned that it's okay to

21  really get in there and it's okay to be competitive.  She's so

22  passive normally by nature.  She's a pleaser.  She just wants

23  everybody to be happy.

24              ████ knows what happened to her.  And as you've

25  heard in the evidence, ████ was asleep and by all accounts,

all that we know, she was asleep.  She doesn't know to this

day what happened to her.  Because I, as a parent, don't know

when the appropriate time is to victimize my child.  When to

tell my child that she has been violated.  That she has had

the trust of someone she loved just torn asunder.  When to

tell her that someone used her as a sexual object, took

pictures of her and traded her like some pornographic baseball

card.  When do I tell her that?  When she's 16?  When she's

18?  When she's getting married?  When she's got kids of her

own?

And if I don't tell her and then she finds out, I've

lied to her and that's something we just don't do.  We have a

strong, strong bond of honesty.  But I don't know how to tell

her this and I don't know when to tell her this.  And all I

can do is hope that if it ever comes out, if I do find the

right time to tell her, that she will understand that I was

just trying to spare her this and protect her in a way that I

couldn't before.

A lot of people have asked me about sentencing.

Trent's parents and I have had multiple conversations.  I talk

with them almost daily.  I made a promise to Trent a long time

ago that I would always be there for him and I would always

help him if I could, but he broke any possibility of me ever

being able to do that for him.  So I've taken it upon myself

to transfer that promise to ██████ and to his family.

1    When his parents need something, they call me.  When

2  he spoke about his stepfather breaking his back, I was there.

3  I am there all the time.  I was just talking to his mom the

4  other day of getting her floors replaced because she suffers

5  from allergies.  I said:  That's what we're here for.  That's

6  what we do.  And she cries and she misses him and she hates

7  what he's done and she's a victim as well.  So is the rest of

8  the family.  But we're all getting through as best as we can.

9    When we were talking about sentencing, his

10  stepfather asked me:  How long do you think he should get?

11  And I said:  I don't know.  I said:  I do know that for the

12  rest of ███████ life, she's going to have these nightmares and

13  she's going to wake up screaming in the night.   ██████ and I

14  will have to carry the secret between us until it's not a

15  secret anymore.  Michelle has to worry every single day about

16  her daughter and so does Jeff.  His parents.  His mother has

17  to deal with losing her child and this anguish that she feels

18  on that, mingled with the disgust at what he's done.

19    And then there's the victims that we haven't

20  identified that we don't know.  They're still out there

21  potentially being harmed by people that he's helped give the

22  tools to facilitate and make this possible.  And it just -- it

23  doesn't feel right but all these people are going to suffer

24  for the rest of their lives, and he gets leniency or he gets a

25  break, an opportunity that they will never have, which is a

1  fresh start.

2          There was one night we were watching a program and

3  they were talking about capital punishment; and he asked my

4  opinion on it and I said:  Well, personally I'm not typically

5  for capital punishment but under the circumstances of someone

6  hurting a child, particularly sexual abuse, violence, things

7  like that, if you're found guilty, then that's it.  And he

8  said:  I don't agree.  I said:  Oh really?  I said:  Why not?

9  He said:  I think the worst thing you can do to someone who

10 does something like that is put them in prison for the rest of

11 their lives so they will know that they will never walk free

12 again.  They will never see their families.  They will never

13 live a normal life.  He says that's the worst thing that you

14 could do to them.  And I said:  Well, we'll just have to agree

15 to disagree on that one.

16          ████ -- ████'s a precious child and so is ████.

17 They didn't ask for this.  These attorneys, they chose to

18 represent people, whether they were guilty or innocent.

19 They've taken that oath.  You've taken an oath to uphold

20 justice for those who deserve it.  Trent chose to do what he

21 did.  Our girls did not choose this.  Our families did not

22 choose this.

23          He's told you a lot about his life growing up and

24 our lives could be pretty much told the same story, just

25 change a few pronouns.  We served in the same military unit

1   together.  We worked on a lot of the same missions together.

2   We knew the same people.  Our parents divorced early.  We both

3   suffered abuse.  We both married and had difficult marriages.

4   We both had children.  We had hopes for the future.  I

5   suffered significantly, as he also says he has.  The

6   difference is, I didn't choose to create new victims.  I chose

7   to protect them.

8           I will never forget that morning.  I was terrified.

9   People ask me:  How did you not kill him?  I said:  That would

10  not have helped my girls.  I am grateful for the people that

11  have come and had to go through our home, who had to uncover

12  all of this because it's not -- it's not a job that I would

13  wish on anyone.  But I'm grateful that they were there to do

14  it because it brought light to all of this for our families,

15  for our girls, and ultimately for Trent.

16          There's nothing that he can say.  There's nothing

17  that he can do to undo what he has done but there is something

18  you can do to make sure that it never happens again; and I

19  hope that you, as difficult as that may be, can make sure that

20  we never have to lay awake at night worrying that he's out

21  there.  That our girls never have to worry about some man

22  driving by looking at them, looking at their kids.  Just keep

23  them safe.  We've tried to; but ultimately, we've done all we

24  can do at this point.  Thank you.

25          THE COURT:  Thank you.

 1          MS. LYNCH:  Your Honor, I do apologize.  I need a

 2    brief break.

 3          THE COURT:  Sure.

 4          MS. LYNCH:  And I also need to make arrangements to

 5    have my children picked up from day-care.

 6          THE COURT:  Let's take about ten minutes or so.

 7          MS. LYNCH:  Thank you.

 8          THE CLERK:  All rise.  Court is in recess.

 9          (A recess was taken at this time.)

10          THE CLERK:  All rise.  Court is in session.  Please

11    be seated.

12          MS. LYNCH:  Your Honor, may we approach?

13          THE COURT:  You may.

14          (Off the record.)

15          THE COURT:  Ms. Preston, on behalf of the

16    government?

17          MS. PRESTON:  Thank you, Your Honor.  Of course, I'd

18    like to thank Your Honor for your patience today.  These

19    mothers have been waiting a long time to talk to you, and

20    thank the Court staff as well.

21          Your Honor, a guideline sentence in this case is

22    sufficient but not greater than necessary to comply with the

23    purposes set forth in 3553(a).  And I say that, Your Honor,

24    knowing that the guideline sentence in this case is equivalent

25    life.  It's 300 years.  And I don't ask for that lightly,

1  judge.  It's an incredibly serious sentence but this case is

2  different.  It is an incredibly serious case.

3        The nature and circumstances of this offense which,

4  of course, we must consider under 3553(a), are some of the

5  worst I've seen in child exploitation work that I've conducted

6  for 14 years.  And so today, I know that the Court has read so

7  thoroughly the Victim Impact Statements, which can say things

8  better than I can, as well as my memorandum.  So I only want

9  to hit a couple of the points that I think make this case

10  stand so far apart from other production of child pornography

11  cases that Your Honor has seen, knowing how many,

12  unfortunately, you have seen in your long service on the

13  bench.

14        But of course, I have a duty, too, to stand here, as

15  they did on behalf of two little girls who are too young to be

16  here and too wounded and vulnerable to process what happened

17  or to speak for themselves.  And I'm also here to speak for

18  the victims who don't have representatives here.  Countless

19  other victims who are exploited through Mr. Walker's online

20  activities.  I'm here to speak on their behalf and seek

21  justice on behalf of them as well.

22        And most importantly, to make absolutely certain to

23  the best of my abilities that the pain that minor victim 2 and

24  minor victim 1 and all of these children that they've endured

25  won't be in vain because this man who did it won't have an

1   opportunity to hurt another child like he hurt them again.

2          So I want to talk about why this case is so

3   different.  Certainly it's because of the brutal and

4   sadomasochistic sexual abuse of minor victim 1 and the sexual

5   abuse of minor victim 2, as well as the production of

6   hundreds, hundreds of images and videos.  And let's remember

7   that each time he takes that image, each time he creates that

8   is another instant of molestation for these children to

9   endure.

10          The distribution of those images to groups of

11  pedophiles and the degrading and horrific chats that I

12  attached as Exhibit B that accompanied those distributions

13  advertising child pornography of his own daughter and his

14  girlfriend's daughter and others and worse yet, moderating.

15  He had a leadership role, judge, in an online group dedicated

16  to the production, distribution, and possession of the worst

17  kinds of child pornography that we in law enforcement see out

18  there.  The degrading and sadomasochistic abuse, violence

19  against the youngest victims, prepubescent images down to

20  babies, judge.  And the training of others to evade detection

21  by law enforcement.

22          The nature and circumstances of this offense are

23  shocking and that fact alone -- that factor, I should say,

24  merits a guideline sentence and against a variance below it.

25  Judge, one of the reasons that I wanted to attach

1  nonpornographic images of minor victims 1 and 2 is so you

2  could see how young they were at the time that this abuse

3  happened.  And I want you to see their faces and what they

4  looked like when they were with their mothers when they were

5  safe and allowed to be little girls; because, unfortunately,

6  the agents and I have seen too many times the images and

7  videos of what they endured when they weren't with their

8  mothers and when they were with him instead.

9         And I will not subject them to more exploitation by

10  showing them in court, judge, and I begged their mothers not

11  to look at them.  And I did my best to lay out in excruciating

12  detail what they endured in my lengthy sentencing memos.

13  Judge, federal agents and I sat in utter horror and watched

14  video after video, image after image of what Mr. Walker did to

15  minor victim 1 and 2.  And I've done this for 14 years.  And

16  so when I tell you that this is among, if not the worst of all

17  of the cases that I have seen, that statement is born for more

18  than a decade of experience and having viewed thousands of

19  hours of watching videos depicting the rapes of little

20  children.

21         These girls were in the defendant's care, custody

22  and control.  One of them was his own child.  The other his

23  girlfriend's daughter.  Someone they trusted.  And I think one

24  of the things that stands apart is not only that this was the

25  defendant's own daughter and someone who was charged with

1  taking care of minor victim 1 and 2, is how young they were.

2  The abuse.  The sadomasochistic abuse of his own daughter

3  happened when she was still in diapers; and we don't see that,

4  thank goodness, all that often.

5          And the other thing I want to point out, judge, is

6  the duration of the abuse.  Six long, torturous years,

7  hundreds of videos and images, day after day after day he was

8  doing this.  Every opportunity he got.  It started right after

9  he got shared custody of her.  He couldn't wait for the

10  opportunity, and it lasted until we arrested him.  And, judge,

11  the only reason we caught him is because of Nicole.  We did

12  not capture him through normal law enforcement detection.

13  Usually we're able to infiltrate these groups online but

14  because of the defendant's sophistication and some of the

15  training that you saw in those chats that he gave to these

16  other child exploiters online and because of the anonymizing

17  software and other obfuscation techniques, we weren't able to

18  infiltrate this case.

19          He was a moderator and one of his duties was to kick

20  people out who broke the rules, and the rules were there to

21  keep them safe from law enforcement.  The damage he did by

22  doing that, by instructing others to act accordingly, is

23  something we can't fathom.  We'll never know.  The only reason

24  we were able to capture him, the only reason he still isn't

25  doing what he was doing, because he was so good at grooming

1    and terrifying his child, I don't think she would have ever

2    self reported.  He was caught by happenstance and by the

3    bravery of minor victim 2's mother, and we will never be able

4    to show our gratefulness for that.

5            Now, I want to make sure that minor victim 2's

6    mother knows that she is seen in this courtroom and she has

7    not been overlooked.  Of course she hasn't.  And you have sat

8    so long on the bench and saw and heard other victims talk

9    about what it's like to walk around in the world knowing that

10   other people are seeing the images of your rape and

11   masturbating to it.  Wondering, for example like we see in the

12   Vicki series, even though she is now a grown adult, she still

13   goes to a grocery store and wonders:  Has this person, this

14   guy looking at me funny, has he seen my videos?  Does he

15   recognize me?  That stays with them, judge, and it's going to

16   stay with minor victim 2.

17           So even though she doesn't probably remember his

18   molestation, that he performed oral sex on her when she was

19   sleeping and masturbate near her, posed next to her with sex

20   objects, she's going to suffer in the future.

21           Your Honor, what happened to minor victim 1 sets

22   this case so far apart from any of the other child

23   exploitation cases I've brought before this Court.  The images

24   and videos were so brutal, and he did this to his own daughter

25   when she was so little.  We know it started when she was a

1  little over a year old.  That's what we can prove after he had

2  gained unfettered access to a child who was too young to even

3  defend herself.

4          At her first Christmas away from her mother, she

5  endured the defendant's sadistic abuse.  It was

6  sadomasochistic.  It was brutal.  It was torturous.  It was

7  indicative of wanton cruelty and it was humiliating and

8  terrifying.  On Christmas Eve, when most parents snuggle up to

9  be with their children and read them a story about Santa

10 Claus, this defendant tied his daughter to a board, ripped off

11 her diaper, bound her hands and knees with a rope; and judge,

12 I will never forget the sounds of her screams from that video

13 and the look on her face.  He used a sex toy to penetrate her

14 vagina and she just screamed and screamed and screamed.  And

15 you could see her tiny little body shaking on that board and

16 the look on her face and the horror and confusion that she was

17 experiencing from the man who was supposed to be her

18 protector, her father; and then he shared it with other

19 people.

20         Where normal feeling human beings shutter at that

21 sight and those sounds of a toddler being raped and tortured,

22 this defendant masturbates to it.  He masturbates to it and

23 revels in it and that is unforgivable.  This is brutal,

24 monstrous criminal behavior and this poor innocent child

25 endured that from her own father who is supposed to love her.

1  I can't even fathom the terror that was going through her head

2  when this was happening to her.

3         The only thing at that age she was capable of doing

4  was screaming.  Just screaming.  And that's just one -- that's

5  just one episode.  There were hundreds of images and videos.

6  So many of them, too, where the defendant is innocuously

7  asking her:  Hold up your skirt; you're pretty; get naked for

8  daddy.  And this poor child is at an age where she had no idea

9  what that meant or signified.  She just did what she was told.

10         And then the terrible videos and images of the

11  defendant urinating on his own child.  He urinated on her.

12  Masturbated over her body as he spread her vagina trying to

13  penetrate her anus and vagina when she was just trying to

14  sleep, and you see her move and struggle.  He would video

15  himself holding various butt plugs and other toys against her

16  tiny body; devices that if he had tried to penetrate her

17  thoroughly or forcibly, that would have destroyed her body

18  from the inside out because the devices were so big and her

19  body was so small.

20         But worse yet, however, was the video that I

21  described in detail to you in my memo of Count 3 and can't

22  show it to anyone in good conscience, when she was three or

23  four-years-old; and the only thing I want to add to that,

24  judge, again, is the agent and I have had to watch that video

25  too many times and what's not in my memo is the sound.  He

beat her.  This wasn't a slight spanking of three or a
four-year-old, judge.  He sat her prone, hands and knees,
spread her vagina and he beat her.  With the first spanking or
slap, you can hear the sounds.  You can hear how much it hurt.
You can see her body rock forward, and you can see her
buttocks turn bright red instantaneously.  That's how hard he
was hitting her.

He degraded her.  He spread apart her vagina and
anus and he made sure he had multiple angles so he could film
the whole thing.  He filmed it with two cameras at least.  One
camera that captured the whole scene and a handheld cellular
phone so he could zoom in and film her vagina and anus.

The audio is cruel evidence of how much she
suffered.  So many times she said:  No, daddy.  She screamed
in terror and this indescribable sound she made with her mouth
as he hit her body.  And then there's her little face.  The
only way I can describe her little face when he was doing this
to her amidst the tears and the screaming and the physical
pain is her face kept looking back and registering:  Why?  Why
is my daddy doing this to me and what will he do next?  And
that's just the physical and the sexual part of the abuse.

The video also shows the psychological component of
his abuse as well.  Judge, this defendant made his sexual and
physical abuse his own daughter's fault in her mind.  And make
no mistake, that wasn't by happenstance.  That was part of the

enjoyment for him.  He is into sadomasochism.  He is into twisting someone's mind so that they hate themselves.

Judge, I attach those chats for a reason so that you could see this was all done purposefully to his own kid.  He told her in this video that she gave him no choice but to do this to her and to film it because she got into trouble at day-care.  He made it about her.  And then he told her he had to do it because he loved her.  My God.  I'm not a psychologist but the ramifications from that type of psychological abuse I think everybody knows will be lasting.

And then you see the sick and perverse way he sat her down on her lap after it was over.  She's sitting there in pain.  You can actually see her squirming because her buttocks hurt so badly because he hit her so many times I lost count.  And she just looks shellshocked.  She's breathing heavily.  She's sore.  And then he makes her kiss him.  He says:  I love you; and she says:  I love you, too.  And then like any three or four-year-old when she was dismissed, she ran off to get a comfort blanket and watch Mickey Mouse.

Judge, this was supposed to be a place that she was safe, that she could call home.  And that video, judge, that I described to you, that's just one episode.  One of six years of this happening to her.  Six long years.  This is not your typical child exploitation case, judge.  It stands so far apart.  There are multiple victims, one of whom was his own

1   child.  The other was in his custody and care.  Hundreds of

2   videos and images.  Sadomasochistic abuse of the youngest that

3   we see, long in duration, brutal and terrifying, which is why

4   I am standing here asking for such a serious sentence.  I

5   wouldn't do it otherwise.

6          Now, this child has to ask her own mother if her

7   daddy, to use her words, ruined her.  What the defendant did

8   is beyond words, beyond comprehension, and makes this case

9   among the worst out of the spectrum of cases that this Court

10  sees that.

11         I won't go into detail because I know that you

12  already know the distribution of this case but, of course,

13  that adds to it for both victims because both minor victims 1

14  and 2 will live with that forever, to know that he reveled in

15  it, did it, and then shared it.  Now others will perpetually

16  revel in it as well.  Judge, that's just so crushing.  They'll

17  never have a chance to feel normal knowing that.

18         His participation in this site also weighs heavily

19  in favor of a guideline sentence.  The fact that he held that

20  moderator role, that has a lasting and negative impact on

21  countless victims.  Now, the names of the site I won't say

22  here publicly because we're keeping them out of the public;

23  but, judge, the chats that occurred, the type of pornography

24  that they were interested in, and the training that he gave

25  these people is something that I hope the Court considers

1  because that will have a lasting impact.

2          Now, one of the things I attach -- I'm sorry, it

3  wasn't Exhibit B; it was Exhibit C -- was some of those chats

4  between the defendant and other members of the site.  Just

5  some of them, and I know you've read them.  He talks about his

6  own daughter as being a good little trained slut.  He talks

7  about feeding her his sperm after he ejaculated.  He instructs

8  others how to humiliate and degrade children by calling them

9  fat so that they get a complex and then force them to lose

10 weight.

11         He encourages others on the site to leave nude

12 images out on a table, invite their children's mean

13 girlfriends over, allow them to see them, and then hope that

14 the mean girls would spread rumors about their daughters at

15 school.  This is sick and perverse stuff and that's all

16 psychological abuse, and he's helping others come up with

17 these ideas.  And it went on and on.  Those are just a few

18 examples.

19         He, of course, as you know, encouraged others to

20 molest prepubescent children, made custom-made child

21 pornography for them so that they could get their own ideas.

22 Dared them to psychologically and physically abuse them.  Give

23 them ideas on how to humiliate them; and then he, more evil

24 than that, taught them how to evade detection.

25         This is a smart and sophisticated criminal who is

1    self taught and could just as easily do at 80 what he did at

2    30.  Mr. Walker's leadership role and participation in these

3    sites means the public needs protection from him.

4            Now, I'll touch briefly, because I did not touch on

5    this at all in my memo, in terms of the history and

6    characteristics of Mr. Walker.  A couple things to address

7    about his cooperation.  First and foremost, the way that that

8    came about is Nicole caught him.  The police were called.  He

9    was under arrest.  And because the case was so brutal and

10   serious, the FBI was called by the local authorities.

11           Once, to use counsel's words, he knew his goose was

12   cooked, he knew he was going to jail, he decided it was time

13   to help the government.  He didn't offer this up.  He didn't

14   make his case federal by saying:  Hey, I want to talk to the

15   FBI.  The FBI was already involved.  I want to make that

16   clear.  The other thing is we had all the forensic evidence

17   against him.  So we already were able to prove his case beyond

18   a reasonable doubt.

19           Now, the other thing here is, I think that he should

20   under 3553(a), he's already received a credit -- a one-point

21   credit off of his guidelines but I do think the Court should

22   consider his cooperation.  It should.  And -- but I want to

23   make sure that the Court is aware that his cooperation had its

24   limits and in part, it's because it was the defendant who

25   taught some of the people on the site so well how to evade

1   detection.  The defendant did keep in his computer system

2   copious notes about the people he was talking about; and his

3   hopes, in his cooperation, was that he could tell us things

4   that would help us to lead to search warrants and arrests.

5   The problem is they all use aliases.  They all use the

6   obfuscation techniques that he taught them and they all use

7   anonymizing software, like he told them to do.

8          We've caught nobody.  We've executed no search

9   warrants and we have no expectation of being able to do that

10  in the future based on his information.  Was it truthful?  We

11  believe so, yes.  Was it complete?  We believe so, yes.  But

12  cooperation has to be more, judge.  It has to be more.  It has

13  to be what the statute says is significant and useful.  And

14  unfortunately, despite it being truthful and complete, which

15  he does deserve credit for that, it didn't yield to being able

16  to save a single kid or save -- or take away a single

17  defendant off of the streets who is perpetuating this type of

18  offense.  And with all due respect to the defendant and his

19  criminal sophistication, the FBI does not need his training in

20  the future.  We've got it covered.

21          Judge, I do think the Court should consider in

22  mitigation that Mr. Walker served our military.  I think that

23  is a factor in his favor.  He also had disclosed a history of

24  undocumented and corroborated sexual abuse.  I think the Court

25  should credit him on that, meaning believe that and take that

 1   into account.

 2          But that means that Mr. Walker himself was in the

 3   best position to know how much his abuse impacted him.  And so

 4   why he turned around and did it to his own child and his

 5   girlfriend's child is beyond me.  I think that Nicole put it

 6   best in saying that she endured some of the same things that

 7   he highlighted when he read his statement to you, but she

 8   didn't choose to take it out on defenseless children.  He did.

 9          Judge, the guidelines in this case are at a level 58

10   for a reason.  Fifty-seven if you take the point off and down

11   to 43 because they're just so off the charts that's what the

12   guidelines say to do, and he's earned every single one of

13   those enhancements.  And what he has argued in mitigation, to

14   be blunt, is just not enough to warrant a variance downward

15   from the guidelines.  It's just not close, in light of what

16   he's done.

17          His behavior, despite what he said, shows his

18   character.  His behavior in those videos, that's who he is.

19   Judge, this is a defendant who has serious mental health

20   issues, an obsession with sadomasochistic sexual abuse of

21   prepubescent children, and in my view, a complete lack of

22   understanding of the pain he has caused and will cause.  I

23   don't think he still to this day has any sense of what he's

24   done here.

25          He spoke so dispassionately to you today about --

and took him sort of -- himself out of the equation when he
would reference the victims in this case.  He talked about how
this was all because of his divorce.  And then told you he
thinks he was a good co-parent?  In what world is he living?
He portrayed himself to you as a good dad who just made some
mistakes.  That's not what happened here.  He actually told
you in his statement today:  We never stayed home bored.  No,
he didn't.

        Judge, the other thing I want to highlight is that
he received treatment.  He was receiving mental health
treatment and still did this.  He still did this.  What that
says to me, and the reason I bring it up, is there is a need
to protect the public from this person.  There is a need to
deter this person.  There is a need to also punish this
person.

        Now, perhaps when he is elderly, it may be more
difficult for him to offend in person, giving him the benefit
of the doubt; but he's smart and he's sophisticated and he's
obsessed and he doesn't get it.  And that says to me there is
a huge risk of recidivism in this case.  I mean, this is a man
who, as he's talking to you today after what he's done, about
wanting a relationship with his daughter and his
grandchildren.  He does not get what he's done to her.

        He talked about his hopes and his dreams.  What
hopes and dreams do they have?  It's not indicative of someone

1  who gets the ramifications of what he's done to these

2  children, especially his daughter.

3          Judge, the reason I am asking for this sentence is

4  he can't get out, judge.  The risk is a far too great and the

5  damage would be irreparable.  Just punishment alone merits a

6  sentence that ensures he won't ever get out and I've

7  referenced it in my memo.  There are other sentences out there

8  that support a sentence of this seriousness, given how far

9  apart it is from some of the other child exploitation offenses

10  you've seen.

11          And I'll end now, judge, talking to you just a bit

12  about the victims in this case but I won't say much because

13  their mothers said it better than I could.  This will forever

14  shape their lives, both of them.  Minor victim 2 will suffer.

15  As I said, even though she was asleep, she's going to know

16  this happened eventually and then she's going to suffer.  She

17  won't survive unscathed.  Her mother will suffer every day

18  knowing it.  We heard this gut wrenching:  When do I tell my

19  child and victimize my child?  That's nothing a parent should

20  have to endure.

21          As for minor victim 1, she's been in psychopathy for

22  two years.  She lives with this every minute of every day.

23  Even when she's smiling, she's living with it.  Knowing that

24  someone who was supposed to love her, beat her, abused her,

25  and enjoyed doing it.  Feeling responsible for her own abuse.

1    Seeing foods that remind her of her dad's semen.  She confuses

2    comfort with sexual behavior and she's still so little.  She's

3    nine years old.  I don't know what's going to happen when she

4    hits puberty or becomes an adult.  How will she see life

5    through the lens he's created for her?

6            She will suffer for a lifetime, judge.  A lifetime.

7    And he should, too.  She deserves to know that he won't get

8    out, will never have a chance to drive by her house, to see

9    her or her children, and will never be able to hurt another

10   little girl like he hurt her.  She deserves to know that the

11   pain she suffered was not in vain and that no one will ever

12   experience this again.

13           And I'd like to thank the mothers who came here

14   today.  Judge, I've been working with them since these charges

15   were filed.  They are strong, wonderful, dedicated mothers and

16   a father.  They grieve every minute for every day of what

17   happened, and they have also suffered because the hands of

18   justice move, unfortunately, so slowly, which each

19   understandable delay in this case for psych evals, Covid, the

20   back and forth.  It's ripped them to shreds each time and

21   they've lived a complete nightmare as a result of what he has

22   done.  And the thing is, he's left them with that

23   responsibility.  They will have ringside seats to their

24   daughters growing up and will have to watch with each new

25   developmental stage how his crimes have destroyed them.

1   They'll have ringside seats for that.

2          He should be happy to sit in jail and avoid that

3   reality because while he sits and watches TV and chats with

4   inmates, these mothers will be left to pick up the pieces he

5   left behind to hug their child then they're scared, confused

6   and self-hating; and then they're left to walk around with the

7   undeserved guilt that parents feel when something horrific

8   happens on their watch.

9          Judge, minor victim 1 and minor victim's 2 mother

10  and father trusted Trent Walker and he betrayed that trust in

11  the worst way possible, and they deserve justice, too; and

12  deserve to know that the man who did this to their daughters

13  will never be free.  His criminal behavior is abhorrent and a

14  guideline sentence is justified here.  His victims have

15  suffered unimaginable pain and will suffer in the future.

16         There is a need for the sentence imposed to reflect

17  the seriousness of this offense, promote respect for the law,

18  afford adequate deterrents to Mr. Walker, to protect the

19  public from him; and most importantly, there is a need for

20  just punishment here for minor victim 1, minor victim 2, and

21  their families because as you heard from their mothers today,

22  their sentence is life and his should reflect that.  Thank

23  you.

24         THE COURT:  Thank you, Ms. Preston.

25         The Court has reviewed the Presentence Investigation

1  Report, has consulted the Advisory Guidelines, has heard

2  comments from counsel for the defendant, heard comments from

3  the defendant, comments from the government, and also from

4  witness testimony.

5        So Ms. Lynch, you and Mr. Walker can come back up.

6        Court now turns to factors set forth in 3553(a).

7  Court shall impose a sentence sufficient but not greater than

8  necessary to comply with the purposes set forth in the code.

9  The Court shall consider the nature and circumstances of the

10 offense and history and characteristics of the defendant.

11       Nature and circumstances of the offense.  Of course,

12 it's not just an offense.  It's many offenses.  Pled guilty to

13 12 counts.  We've all heard many of the details here today.

14 Defendant sexually abused -- and I don't think torture is an

15 inappropriate word here for what you did to your daughter and

16 you're shaking your head that you agree.  Pretty plain to me

17 that a little child one year -- a little more than

18 one-year-old, what you did, it can't be anything less than

19 torture.

20       I've been a judge now for going on 32 years and I

21 thought I've seen and heard everything, which I have, over the

22 years but this is right at the top of one of the most

23 horrific, incredible, almost unbelievable set of facts that

24 I've ever heard.  I've had death cases, horrible murders.

25 Obviously, Ms. Preston indicated earlier, I've heard a lot of

child exploitation cases, child pornography cases but I can't

remember one in all the years where it was the father who

exploited the daughter, an infant daughter, one-year-old for a

six-year period of time.  And I'm convinced, Mr. Walker, that

if you hadn't been caught, you'd still be doing this.  You

have to agree with that, right?

THE DEFENDANT:  I do have that concern, judge.

THE COURT:  I can't hear you.

THE DEFENDANT:  I do have that concern.

THE COURT:  Well, I do, too.  I think it's pretty

obvious you've got an addiction to sexually abusing in

sadomasochistic fashion young children.  And what you did to

your daughter and her friend -- your girlfriend's daughter

when they were in your control, care, and custody, they

trusted you and well, you blew that trust out of the water.  I

mean -- and you took advantage of that.

And then took hundreds of videos and images and then

distributed them on some kind of chat network that I'm not all

familiar with, in which you were the moderator.  You were the

guy directing.  You were the director of all of this.  And

people could participate based upon your approval.  I read

some of those chats.  I couldn't read them all.  Horrible,

right?  I mean, can you even write that stuff what you guys

were talking about?

THE DEFENDANT:  Some of that I did write, yes, Your

 1   Honor.

 2           THE COURT:  And instructing these folks how to --

 3   how to avoid detection, which I guess is still working because

 4   the FBI -- and my experience dealing with the FBI over all

 5   these years is that when they want to find something out, they

 6   do it and they usually get the result when they do.  But this

 7   has stymied them.

 8           And then the need to order images.  People could

 9   order up from you what they wanted you to do with these kids,

10   right, the custom -- the custom images?

11           THE DEFENDANT:  No.

12           THE COURT:  What's that?

13           THE DEFENDANT:  No, Your Honor.  I had taken images

14   and then occasionally, as you saw, I would distribute them and

15   when I did, I would put other people's names on them.  They

16   weren't made to order for anyone.  But either way, it's wrong.

17           THE COURT:  I thought I saw somewhere in one of

18   those chats that somebody would like to have a certain image

19   or have your daughter do something and you went ahead and did

20   it.  Well, we could go on and on.  We've heard enough here

21   today about what the nature and circumstances of the offenses

22   are and quite frankly, it makes me sick to even talk about it;

23   and I can't remember in 31 years ever saying that in a case.

24   It's just horrific.  I'm having trouble with it.

25           And also considering your background.  As

1  Mrs. Preston indicated, you do have some mitigation here.  You

2  served our country in the military for a period of time, eight

3  years.  You cooperated the best you could, I guess, with the

4  government.  Of course, people cooperate once they -- once

5  they know they're caught.  More than likely, they do

6  cooperate.  But as we just discussed, if you hadn't been

7  caught, you more than likely would still be doing this type of

8  thing.

9          You had some abuse yourself that you report in the

10  Presentence Investigation Report.  There's some information in

11  the report there may be the diagnosis with post traumatic

12  stress syndrome and also some anxiety and depression as well.

13  You've got some mental health issues, it's pretty obvious; and

14  while you're at the Bureau of Prisons, that type of counseling

15  and therapy will be provided for you, as well, of course, sex

16  offender as well.  You've got this addiction to child

17  pornography and sadomasochistic treatment of young kids and

18  that's something you're going to have to have treatment for.

19          Addictions -- you can't just turn an addiction on

20  and off.  Once it's on, it hardly ever goes off.  Many times

21  you try to turn it off and you relapse, just like somebody

22  addicted to alcohol or drugs.  We've all known people in our

23  lives and others that have had addictions and they've sought

24  treatment, stay clean, sober for years and then relapse.  And

25  so that's what addictions are all about and you can't just

1    say:  I'm not going to do it anymore.  I'm not going to drink

2    anymore.  I'm not going to do it.

3            But you do have some mitigation.  You don't have

4    much of a criminal history.  You appear to be a relatively

5    intelligent man.  It's too bad you couldn't use that

6    intelligence in a more productive way; but you used the

7    intelligence that you had to help others commit crimes by

8    instructing them how to avoid law enforcement when they're

9    doing child pornography and other types of criminal activity

10   related to that.

11           Need for the sentence imposed to reflect the

12   seriousness of the offense, promote respect for the law, and

13   provide just punishment.  The seriousness of the offense, it

14   can't be more serious, really.  You agree with that?

15           THE DEFENDANT:  I do agree with that.

16           THE COURT:  Can't be much more serious.  You see

17   that Congress has put mandatory minimum sentences on many of

18   these charges.  Fifteen years is an absolute minimum sentence

19   I can possibly give you.

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  And promote respect for the law, provide

22   just punishment for the offense.  Of course, any sentence we

23   impose we hope promotes respect for the law and is just

24   punishment.  We want to be fair and just.  If our system is

25   not perceived to be fair and just, it will fail.  So that's

1  why we go through all of this in great detail when you're

2  sentencing somebody so we can make sure and take care -- and

3  take consideration of all aspects of the case and the

4  individuals involved.

5       Afford adequate deterrents to criminal conduct.  Of

6  course, any sentence that we impose on a criminal conviction

7  and sentence we hope deters others who are contemplating

8  similar criminal activity or committing similar criminal

9  activity from maybe thinking twice about continuing to do

10  that.  Also deterrents to individuals who are standing in

11  front of me as well.

12       I don't know how much success we're having.  The

13  numbers keep going up year and year and year.  Agents tell me

14  they could arrest somebody for this every day.  And of course,

15  it's so easy to do now, right?  Because of computers.  All you

16  have to do is type in some stuff and then you can get in these

17  chat rooms and then, as you can see, it gets out of control.

18       THE DEFENDANT:  Very much so.

19       THE COURT:  Before computers, it was much more

20  difficult to have this.  But just because it's easy doesn't

21  take away the seriousness of the criminal activity.

22       Protect the public from further crimes of the

23  defendant.  I always give great weight to this.  I do have

24  some serious issues about that.  Minor victim 1, minor victim

25  2 are still young children.  They're going to be around for a

1  long time.  I can't put them in harms way with you.  I just

2  can't do that.  I can't have them or any of their family

3  members looking over their shoulders.  Where's Trent?  Is he

4  out?  Has he been granted parole?  Has he been granted early

5  release?  Those type of things.  I can't risk that because as

6  you tell me yourself, you've got concern about your ability to

7  stop doing this and that's a real concern that we have.

8          Provide the defendant with needed education,

9  vocational training, medical care, or other correctional

10  treatment in the most effective manner.  You've got education.

11  You should continue to educate yourself.  You've got some

12  mental issues.  Those will be addressed at the Bureau of

13  Prisons, as will also your sex offender treatment will be

14  provided as well.

15          And the need to avoid unwarranted sentence

16  disparities among defendant's with similar records been found

17  guilty of similar conduct.  I've sentenced dozens and dozens

18  of these kinds of cases, people with similar backgrounds that

19  you have.  Most of the people that we see come through here on

20  child pornography cases don't have any criminal record.  Very

21  little criminal record.  I have doctors who have come through

22  here before and been watching child pornography, and I've

23  sentenced them to prison.  People who have worked for the post

24  office for years and years and years.  I mean, just people

25  that don't have much of a criminal history come through here

1   on these types of cases.

2          So your backgrounds are similar but the level of

3   conduct is not.  As I indicated, I haven't seen this type of

4   horrific -- as I said, torture and these kids were tortured

5   and they will never forget.  Mothers will never forget as well

6   on this.  Mothers are doing a great job trying to get these --

7   steer these kids through it.  Never know what's going to

8   happen later on with your daughter -- your former daughter.

9   Got a father now, Jeff, and you indicated you were happy that

10  he is providing that parental guidance now and that's a good

11  thing that she does have a dad now.

12          But it's going to be work when these kids become

13  teenagers.  And as parents, we all know the teen years are

14  tough.  Your kids can go -- take one fork in the road or the

15  other fork in the road or down the middle.  We never know

16  what's going to happen to them but we always worry about it

17  and we always try to give them guidance and give them the best

18  advice that we can, and the care and safety that we can; but

19  these two -- these two victims, minor 1 and minor 2, if

20  something happens, either by their conduct or some other

21  failing that they may have -- and we all hope they don't --

22  may certainly be traced back to all of this.

23          I've got great faith in the mothers back there to do

24  their best to raise them to be good, productive, sharp,

25  educated young girls and I'm sure they will be, but there's

 1  always going to be that lingering in the background here on

 2  this.

 3           So you've asked in your sentencing memorandum for a

 4  sentence of 15 to 40 years.  That would be an unwarranted

 5  disparity if I sentence you to that type of sentence,

 6  considering your conduct here.  There's really no other case I

 7  can compare that -- compare you to at this point.  Almost all

 8  the cases I've seen before coming anywhere close to this

 9  didn't involve your own children on this.

10           So the Court now has considered 3553(a), now is

11  ready to impose judgment and sentence.  Ms. Lynch, do you know

12  of any legal reason why the Court cannot impose judgment and

13  sentence?

14           MS. LYNCH:  No, Your Honor.

15           THE COURT:  Ms. Preston?

16           MS. PRESTON:  No, Your Honor.

17           THE COURT:  All right.  Court enters judgment of

18  conviction on Counts 1, 2, 3, 4, and 5, all counts sexual

19  exploitation of a child, violation of 18 U.S. Code 2251(a).

20  Court enters judgment of conviction on Count 6, noticing and

21  advertising child pornography, a violation of 18 U.S. Code

22  Section 2251(d).  Court enters judgment of conviction on

23  Counts 7, 8, 9, 10 and 11, distribution of child pornography,

24  a violation of 18 U.S. Code Section 2252(a)(2); and Count 12,

25  possession of child pornography, a violation of 18 U.S. Code

1   Section 2252(a)(4)(B).

2           Pursuant to the Sentencing Reform Act of 1984, it is

3   the judgment of the Court the defendant, Trent Walker, is

4   hereby committed to the custody of the Bureau of Prisons to be

5   imprisoned for a term of 25 years on Count 1, 25 years on

6   Count 2, 25 years on Count 3, 25 years on Count 4, 25 years on

7   Count 5, 25 years on Count 6, all to run consecutively for a

8   total of 150 years.

9           The Court now sentences of defendant on Count 7 to

10  ten years in prison; Count 8, ten years in prison; Count 9,

11  ten years in prison; Count 10, ten years in prison; Count 11,

12  ten years in prison, for a total of 50 years on Counts 7

13  through 11 because they run consecutively.

14          On Count 12, the Court now sentences the defendant

15  to ten years in prison.  The total sentence is 210 years in

16  the Bureau of Prisons.

17          The Court is not ordering a fine based on the amount

18  of other monetary penalties owed in this case.  Restitution to

19  minor victim 1, $10,000; minor victim 2, $10,000.  Payments

20  made directly to clerk, U.S. District Court for proportionate

21  distribution to the victims.

22          Defendant shall notify the U.S. Attorney for this

23  district within 30 days of any change in mailing or residence

24  address that occurs while any portion of the restitution

25  remains unpaid.  Any unpaid restitution balance shall be paid

1  during the term of supervision at a rate of not less than ten

2  percent of the defendant's gross monthly income.

3           Defendant shall notify the probation officer of any

4  material change in economic circumstances that might affect

5  his ability to pay restitution.

6           Defendant shall forfeit to the United States a

7  custom-built computer with seven hard drives and physical

8  evidence seized from the residence on August 11, 2019.

9           Supervised release is required by statute.  The

10 Court is imposing a life term on each of Counts 1 through 12

11 to be served concurrently based on the nature of the instant

12 offense and personal history and characteristics of the

13 defendant.

14          While on supervised release, defendant shall not

15 commit another federal, state or local crime; shall cooperate

16 with the collection of a DNA sample and shall refrain from any

17 unlawful use of a controlled substance and shall submit to one

18 drug test within 15 days of placement on supervised release

19 and two periodic tests thereafter as directed by the probation

20 officer.

21          Defendant shall also comply with the requirements of

22 the Sex Offender Registration and Notification Act as directed

23 by the probation officer.

24          To promote respect for the law, prevent recidivism,

25 and aid in the adequate supervision, the defendant shall also

1  comply with the following conditions of supervision as

2  referenced in the Presentence Report.

3          Mr. Walker, you recall when we reviewed the

4  information in your Presentence Report, I'd asked you if you'd

5  been able to read and discuss with your attorney the mandatory

6  and proposed conditions of supervision?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And you indicated to me you'd done so?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And you had no objections to those

11 conditions?

12         THE DEFENDANT:  Not that I recall, Your Honor.

13         THE COURT:  I can read those conditions to you or

14 you can waive my reading of those to you.

15         THE DEFENDANT:  Seems like a moot point now, Your

16 Honor.

17         MS. LYNCH:  Say you'll waive them.

18         THE DEFENDANT:  I'll waive them.

19         THE COURT:  Further order the defendant pay a

20 special assessment of $1,200.  That's $100 for each count.

21 Payment of special assessment due immediately, made directly

22 to the clerk, United States District Court.

23         That is your sentence, Mr. Walker.  Do you have any

24 questions about anything?

25         THE DEFENDANT:  No, Your Honor.

1          THE COURT:  I could have given you the 300 years as

2     requested by the government but I did take into consideration

3     you did serve in the military.  You did cooperate a little bit

4     but I could not take the risk of you ever leaving prison as

5     well.  So 210 years pretty much guarantees that you will

6     remain in prison for the rest of your life.

7          You have a right to appeal the conviction and

8     sentence.  Do you understand this?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  You remember when we reviewed your plea

11    agreement in great detail several hours ago?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  A provision of your plea agreement

14    discussed your right to appeal and it stated, in part, that in

15    exchange for concessions made to you by the United States in

16    arriving at the plea agreement, if I accept the plea agreement

17    and sentence you pursuant to the plea agreement, then you

18    would be giving up or waiving your right to appeal the

19    conviction and sentence in this case to a higher court.

20         Do you remember that discussion?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  I have accepted the plea agreement and

23    sentenced you pursuant to the plea agreement.  Therefore, in

24    my opinion, you've waived or given up your right to appeal.

25    But if you disagree, discuss it with your attorney.  If you

1   wish to file an appeal, you must file a notice of appeal with

2   the clerk of the Court within 14 days of entry of judgment in

3   this matter.  Do you understand this?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And your attorney or the clerk will file

6   that notice for you, if you wish to appeal.

7              Bureau of Prisons, I think you requested Marion,

8   Illinois.

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Court recommends the defendant be housed

11  in a Bureau of Prisons facility located in Marion, Illinois,

12  due to its sex offender treatment programs offered by the

13  Bureau at that particular facility.  The Bureau will try to

14  follow our recommendations the best they can.  Sometimes they

15  cannot due to space limitations or security level requirements

16  but they'll do their best to get you to that facility,

17  considering the nature of the convictions and your background.

18  If not, then the Court recommends Tucson, Arizona, as well as

19  another facility.

20             Any questions about anything, Mr. Walker?

21             THE DEFENDANT:  No, Your Honor.

22             THE COURT:  Anything else today, Ms. Lynch?

23             MS. LYNCH:  No, Your Honor.

24             THE COURT:  Ms. Preston?

25             MS. PRESTON:  Judge, I believe you already noted

1   this but the $10,000 each as agreed to each minor victims, 1

2   and 2, but I believe that was already noted.  And Ms. Lynch is

3   shaking her head.  So I appreciate that, judge.

4            MS. LYNCH:  I wrote it down.

5            THE COURT:  It was agreed upon, right?

6            MS. LYNCH:  Yes, it was.

7            THE COURT:  I thought I read that.

8            MS. PRESTON:  I think you did, Your Honor.

9            MS. LYNCH:  You did.  I wrote it down.

10           THE COURT:  Anything else today, Ms. Preston?

11           MS. PRESTON:  No.  Thank you, your Honor.

12           THE COURT:  Marshals, thank you very much for

13   spending the day; and your comments from the moms, very much

14   appreciated.  Good luck to you.

15           THE CLERK:  All rise.  Court is adjourned.

16           (Court proceedings concluded at 5:23 p.m.)

17

18

19

20

21

22

23

24

25

1   **************************************************************

2                CERTIFICATE OF COURT REPORTER

3

4       I, Margaret A. Techert, hereby certify that the

5   foregoing is a true and correct copy of the

6   transcript originally filed with the clerk of court

7   on March 2, 2022 and incorporating redactions of

8   personal identifiers requested by the following

9   attorneys of record:  Tiffany Preston, in accordance

10  with Judicial Conference.  Redacted characters

11  appears as a black bax in the transcript.

12

13

14

15  /S/ Margaret A. Techert_____        **March 18, 2022**
    MARGARET A. TECHERT
16  Official Court Reporter
    Southern District of Indiana
17  Evansville Division

18

19

20

21

22

23

24

25